**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR FOOD SAFETY, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, *et al*., <br><br> Defendants, <br><br> and <br><br> CORTEVA AGRISCIENCE, LLC, <br><br> Defendant-Intervenor. | Case No. 1:23-cv-1633 |

**DEFENDANT-INTERVENOR CORTEVA AGRISCIENCE, LLC'S CROSS-MOTION**
**FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' REVISED**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS .......................................................................................3

STANDARD OF REVIEW .......................................................................................4

ARGUMENT ...........................................................................................................5

I.     EPA's conclusion that the Registration Amendment will not have unreasonable adverse effects is reasonable and entitled to deference. ............5

     A.     EPA's comparative assessment of Enlist against alternative weed control methods is reasonable, supported by the record, and within EPA's expertise.....................................................................................5

          1.     EPA reasonably determined that removal of Enlist would increase soybean and cotton farmers' reliance on alternatives that pose greater risks. ..........................................6

          2.     EPA reasonably assessed Enlist's benefits to corn crops. ........9

          3.     EPA reasonably determined that nonchemical weed control methods are not viable alternatives to Enlist. ..........................9

     B.     EPA reasonably relied on the best available usage data, and any error was harmless. ..........................................................................11

     C.     EPA reasonably assessed and mitigated Enlist's impact on weed resistance.......................................................................................12

          1.     EPA's qualitative assessment of Enlist's impact on weed resistance was reasonable in the absence of quantitative data.................................................................................................13

          2.     Plaintiffs' arguments that Enlist worsens weed resistance are without merit. ....................................................................16

               a.     Plaintiffs' resistance arguments are misleading and the characteristics they attribute to Enlist are shared by its alternatives. ........................................................16

               b.     EPA's assessment of Enlist's resistance management benefits is supported by the record.......................20

               c.     Removing Enlist from the market would accelerate resistance.............................................................21

     D.     The record amply supports EPA's classification of 2,4-D as "Not Classifiable as to Human Carcinogenicity."........................................23

          1.     Animal data supports EPA's Group D carcinogenicity classification for 2,4-D..................................................................23

2.   Epidemiological data supports EPA's Group D carcinogenicity classification for 2,4-D. .................................................25

E.   EPA applied its extensive technical expertise and reasonably concluded that the Enlist label sufficiently mitigates the potential for adverse effects. ......................................................................................27

1.   Incident data confirms that the spray drift buffer effectively mitigates effects from potential off-target movement. ..........................27

2.   Enlist's runoff mitigation pick list is a reasonable, tailored approach to reducing 2,4-D runoff. .........................................................28

II.   EPA was not required to assess glyphosate's human health risks in issuing the Registration Amendment. ......................................................................31

III.   Vacatur is not warranted because any deficiency in EPA's analysis is not serious and vacatur would cause severe disruption to U.S. agriculture and the environment. ......................................................................................33

A.   Any deficiency in EPA's analysis is not serious, and there is at least a serious possibility that EPA will reach the same result on remand. ......................................................................................................34

B.   Vacatur would cause severe agricultural and environmental disruption. ......................................................................................35

1.   Vacatur would be disruptive to growers and U.S. agriculture. ......................................................................................36

2.   Vacatur would cause adverse environmental impacts. ..........................39

CONCLUSION ......................................................................................................40

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)......................................................................................34, 36

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017)......................................................................................39, 40

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) ..............................................................................8, 38, 39, 40

*Dist. Hosp. Partners v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015).............................................................................................19

*Eco Tour Adventures, Inc. v. Zinke*,
249 F.Supp.3d 360 (D.D.C. 2017).....................................................................................36

*EME Homer City Generation, L.P. v. EPA*,
795 F.3d 118 (D.C. Cir. 2015)...........................................................................................36

*Esch v. Yeutter*,
876 F.2d 976 (D.C. Cir. 1989)...........................................................................................36

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)...........................................................................................................14

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009)..............................................................................33, 34, 35

*Migrant Clinicians Network v. EPA*,
88 F.4th 830 (9th Cir. 2023) ..............................................................................15, 16, 19, 21

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019)...............................................................................................15

*Nat'l Fam. Farm Coal. v. EPA*,
960 F.3d 1120 (9th Cir. 2020) ..............................................................................7, 13, 14, 21

*Nat'l Fam. Farm Coal. v. EPA*,
966 F.3d 893 (9th Cir. 2020) ..............................................................5, 7, 13, 14, 21, 32, 33

---

[*] Cases with asterisks indicate authorities on which we chiefly rely.

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
　753 F.Supp.2d 103 (D.D.C. 2010) ..................................................................................18, 31

*New York v. EPA*,
　413 F.3d 3 (D.C. Cir. 2005) .....................................................................................................19

*North Carolina v. EPA*,
　550 F.3d 1176 (D.C. Cir. 2008) ...............................................................................................36

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n*,
　896 F.3d 520 (D.C. Cir. 2018) .................................................................................................39

*\*Open Soc'y Inst. v. USCIS*,
　573 F.Supp.3d 294 (D.D.C. 2021) ..............................................................................4, 5, 9, 19

*PDK Labs., Inc. v. DEA*,
　362 F.3d 786 (D.C. Cir. 2004) .................................................................................................11

*Prohibition Juice Co. v. FDA*,
　45 F.4th 8 (D.C. Cir. 2022) ......................................................................................................12

*Sec'y of Lab. v. Knight Hawk Coal, LLC*,
　991 F.3d 1297 (D.C. Cir. 2021) .................................................................................................5

*Sierra Club v. U.S. Army Corps of Eng'rs*,
　64 F.Supp.3d 128 (D.D.C. 2014) ...............................................................................................5

*Sinclair Wyo. Refin. Co. v. EPA*,
　101 F.4th 871 (D.C. Cir. 2024) ................................................................................................15

*\*Wisconsin v. EPA*,
　938 F.3d 303 (D.C. Cir. 2019) .......................................................................................5, 23, 27

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................................................5

*7 U.S.C. § 136(bb) .........................................................................................................4, 29, 30

7 U.S.C. § 136a(c)(5) ......................................................................................................................4

7 U.S.C. § 136a(c)(5)(D) ..........................................................................................................8, 32

7 U.S.C. § 136a(g) .........................................................................................................................33

7 U.S.C. § 136a(g)(1)(A) ...............................................................................................................33

7 U.S.C. § 136j(a)(2)(G) ................................................................................................................31

iv

7 U.S.C. § 136n(a) ...............................................................................................................4

**Other Authorities**

90 Fed. Reg. 59517 (Dec. 19, 2025) .................................................................................1

**INTRODUCTION**

This Court should grant summary judgment in favor of Intervenor Corteva Agriscience LLC ("Corteva") because the Registration Amendment for Enlist One® reflects a thorough, scientifically grounded cost-benefit analysis that is amply supported by the administrative record and must be sustained under the highly deferential standard of review applicable to scientific determinations within an agency's expertise. Plaintiffs' contrary arguments rest on selective quotation and mischaracterization of the record and fail to demonstrate that the U.S. Environmental Protection Agency ("EPA" or the "Agency") acted arbitrarily in concluding that Enlist's registration will not cause unreasonable adverse effects on the environment.

The product at issue here, Enlist One®, is an agricultural herbicide containing a choline salt formulation of 2,4-D, an active ingredient that has been registered and widely used for decades. Enlist[1] is a marked improvement over conventional 2,4-D formulations—which will remain registered regardless of this litigation's outcome—because its proprietary choline salt technology is designed to prevent the herbicide from drifting or evaporating onto neighboring fields when applied according to the federally approved label. Corteva developed the Enlist weed control system, comprising the Enlist herbicide and crops genetically engineered to tolerate 2,4-D choline applications, to provide farmers an effective tool for managing hard-to-control weeds—while substantially reducing the off-target risks associated with conventional 2,4-D. Despite these advantages, Plaintiffs challenge the Registration Amendment and seek to remove Enlist from the market—including on environmental grounds, no less—notwithstanding that Enlist was

---

[1] Unless otherwise indicated, "Enlist" refers to Enlist One®, which contains 2,4-D choline salt as its sole active ingredient and is the only Enlist product at issue here. Corteva voluntarily cancelled the registration for Enlist Duo, a separate product containing 2,4-D choline salt and glyphosate. EPA, *Cancellation Order for Certain Pesticide Registrations and/or Amendments to Terminate Uses…*, 90 Fed. Reg. 59517, 59517 tbl. 1 (Dec. 19, 2025).

engineered to reduce the environmental risks of conventional 2,4-D and that its removal would drive growers toward alternatives with less favorable efficacy and environmental profiles.

On the merits, each of Plaintiffs' challenges fails. EPA acted lawfully and reasonably in issuing the Registration Amendment after conducting a comprehensive evaluation of Enlist's costs and benefits. EPA assessed Enlist against the leading available alternatives—which are not fungible, as growers would have to switch to a different seed technology to deploy an alternative herbicide—and concluded that its continued registration would not cause unreasonable adverse effects. That conclusion rests on EPA's determination that removing Enlist would increase grower reliance on alternatives with greater environmental risks, and on incident data confirming that allegations of off-target movement from Enlist are comparatively rare and have declined even as treated acreage has expanded. EPA's analysis is entitled to the substantial deference courts afford to scientific determinations within an agency's expertise.

Plaintiffs' arguments cannot overcome this record. They conflate Enlist with conventional 2,4-D formulations, invoke isolated incidents to suggest that Enlist poses greater risks than available alternatives, and disregard overwhelming evidence that those alternatives have caused more extensive off-target damage. They challenge EPA's herbicide resistance analysis while ignoring Enlist's resistance management benefits and the undisputed evidence that herbicide resistance will worsen in Enlist's absence. And they challenge EPA's carcinogenicity classification for 2,4-D by selectively citing decades-old studies that EPA reasonably rejected as flawed, while disregarding more recent analyses that undermine their position. Each argument fails under the deferential standard applicable here.

Even if the Court identifies a deficiency in EPA's analysis, vacatur would be unwarranted. EPA's core determinations—that Enlist compares favorably to alternatives, provides critical

resistance management benefits, and does not pose unreasonable human health risks—are amply supported by the record and would likely be reaffirmed on remand. Meanwhile, vacatur would inflict severe and potentially irreversible harm by depriving growers of an indispensable weed management tool, forcing a shift to alternatives with greater environmental risks, and threatening decades of soil conservation progress. The appropriate remedy, should the Court find error, is remand without vacatur while EPA addresses any identified shortcomings.

### STATEMENT OF FACTS

Corteva incorporates by reference the Factual and Procedural Background presented in EPA's Cross-Motion for Summary Judgment and Response to Plaintiffs' Revised Motion for Summary Judgment ("EPA Br.") 3-17,[2] and offers the following additional information.

In issuing the Registration Amendment, EPA evaluated Enlist against the leading available alternatives for post-emergence weed control in soybean, cotton, and corn. EPA determined that soybean and cotton growers have only three primary post-emergence options—dicamba, Enlist, and glufosinate—and that only dicamba is "a true alternative" to 2,4-D. A028 at 2. EPA concluded that removing Enlist from the market would increase reliance on dicamba, risking greater off-target movement and environmental effects. *Id.* at 7. EPA further found that alleged incidents from off-target movement of Enlist "have been relatively rare" compared to the "thousands" of dicamba complaints over the same period. *Id.* at 9.

EPA assessed Enlist's impact on herbicide resistance and concluded that it provides an effective mode of action to slow resistance development. A029 at 9. Although cross-resistance between dicamba and 2,4-D had decreased Enlist's benefits, EPA found Enlist remains "highly

---

[2] Corteva does so to avoid duplication and to present its positions and interests in a consolidated fashion pursuant to this Court's March 26, 2024 Memorandum Opinion granting Corteva's intervention (Dkt. No. 37).

important" for controlling herbicide-resistant broadleaf weeds. A021 at 23. To address resistance risks, EPA imposed an herbicide resistance management plan requiring resistance testing, investigation of efficacy complaints, and reporting of grower usage data. *Id.* at 41; A029 at 2, 13.

EPA implemented a multi-layered mitigation framework to address potential off-target effects. For spray drift, EPA determined that a 30-foot buffer combined with nozzle restrictions sufficiently reduces the potential for off-field exposures, and required testing of approved tank-mix partners to confirm they do not adversely affect drift properties. A021 at 25, 41-42. For runoff, EPA implemented a two-tier framework of mandatory baseline measures and a credit-based pick list of supplemental practices calibrated to site-specific conditions. A022 at 12, 14-15, 22.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████.

### STANDARD OF REVIEW

Under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), this Court must uphold the Registration Amendment if it finds "a reasonable mind might accept [the] record as adequate to support [EPA's] conclusion,"[3] that extending the Enlist registration would not cause "unreasonable adverse effects" "to man or the environment, taking into account the economic, social, and environmental costs and benefits" of the use of Enlist. 7 U.S.C. § 136(bb); *id.* § 136a(c)(5). Because FIFRA does not prescribe a standard of review for actions brought in district court under 7 U.S.C. § 136n(a), courts apply the Administrative Procedure Act's default standard,

---

[3] *Open Soc'y Inst. v. USCIS*, 573 F.Supp.3d 294, 316 (D.D.C. 2021).

4

under which agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F.Supp.3d 128, 142 (D.D.C. 2014); 5 U.S.C. § 706(2)(A).

This review is "highly deferential to the agency fact-finder," and the Court "may not reject reasonable findings and conclusions, even if [it] would have weighed the evidence differently." *Sec'y of Lab. v. Knight Hawk Coal, LLC*, 991 F.3d 1297, 1308-09 (D.C. Cir. 2021) (citations omitted). Deference is at its apex where the court reviews "scientific determinations" within EPA's expertise. *Wisconsin v. EPA*, 938 F.3d 303, 320 (D.C. Cir. 2019). And even if it could be critiqued in some respects, a registration decision must be upheld if it is reasonably sound on the whole. *See Nat'l Fam. Farm Coal. v. EPA* ("*NFFC*"), 966 F.3d 893, 920-21 (9th Cir. 2020).

## ARGUMENT

### I. EPA's conclusion that the Registration Amendment will not have unreasonable adverse effects is reasonable and entitled to deference.

EPA's determination that Enlist will not cause unreasonable adverse effects on the environment reflects a reasoned application of FIFRA's cost-benefit standard and is entitled to substantial deference, particularly where, as here, it rests on scientific judgments squarely within the Agency's expertise. At the very least, EPA's decision to issue the Registration Amendment is one a "reasonable mind might accept" given the ample supporting data in the record. *Open Soc'y Inst.*, 573 F.Supp.3d at 316. The Court should decline Plaintiffs' invitation to second-guess EPA's judgment and decline to vacate the Registration Amendment.

#### A. EPA's comparative assessment of Enlist against alternative weed control methods is reasonable, supported by the record, and within EPA's expertise.

In conducting its cost-benefit analysis under FIFRA, EPA determined that removing Enlist from the market would cause growers to shift to dicamba as the primary post-emergence herbicide for broadleaf weed control in cotton and soybean, which EPA asserts may result in greater

environmental harm from off-target movement. *See* A029 at 9-10; A028 at 7 ("Increased usage of dicamba to replace Enlist 2,4-D may have negative effects associated with off-target movement of dicamba including damage to sensitive crops and natural areas."). That determination is amply supported by the record and entitled to deference.

Plaintiffs argue that EPA "lacks support for its 'substitution assumption' that growers would switch to dicamba in the absence of Enlist" because growers have several alternative weed management options. Pls' Br. 38. This assertion is squarely contradicted by the record and reflects a fundamental misunderstanding of the agronomic realities of post-emergence weed control. As set forth below, the available chemical alternatives to Enlist pose greater potential environmental risks from off-target movement, and nonchemical weed control methods are not viable substitutes for the post-emergence control that Enlist provides.

### 1. EPA reasonably determined that removal of Enlist would increase soybean and cotton farmers' reliance on alternatives that pose greater risks.

EPA's determination that soybean and cotton growers would increase reliance on dicamba in the absence of Enlist is amply supported by the record. As EPA explained, "soybean and cotton growers facing herbicide-resistant broadleaf weeds ha[ve] only three primary options for postemergence herbicide control" including "a dicamba-tolerant system (Xtend), a 2,4-D tolerant system (Enlist), and a glufosinate tolerant system (Liberty Link)." A029 at 8. Of these, only dicamba is a "true alternative to 2,4-D" because after crop emergence, "glufosinate is primarily a partner in resistance management programs." A028 at 2. Removing Enlist from the market would thus effectively eliminate 2,4-D for post-emergence control in cotton and soybean, leaving dicamba as the sole effective option. Plaintiffs claim that EPA ignored the risk that Enlist displaces herbicide systems that pose less off-target movement risk than either 2,4-D or dicamba, Pls' Br.

6

38, but they fail to identify any herbicide system with lower off-target risks that would also provide effective post-emergence weed control for these crops—and as EPA explained, none exists.

Having failed to identify any alternative with lower off-target risks, Plaintiffs argue that Enlist poses the same or greater risks than dicamba. *See id.* This contention fares no better. Plaintiffs selectively cite isolated language and a few incidents involving 2,4-D—without distinguishing between Enlist and conventional 2,4-D products that lack Enlist's enhanced volatility and drift profile. *Id.* at 39. The record confirms that, since Enlist's initial registration in 2017, "incidences of off-target movement . . . have been relatively rare" compared to over-the-top dicamba herbicides, "which have thousands of reported incidents over the same period." A028 at 9; *see also id.* at 7. Indeed, the case on which Plaintiffs rely throughout their brief, *National Family Farm Coalition v. EPA* ("*NFFC*"), acknowledged that use of dicamba in 2017 and 2018 "had caused enormous and unprecedented damage." 960 F.3d 1120, 1144 (9th Cir. 2020).

Plaintiffs' own citations (at 39), read in context, confirm this conclusion. The article Plaintiffs cite to assert that 2,4-D complaints exceeded dicamba complaints in Indiana in 2021 does not distinguish between Enlist and conventional 2,4-D and reported only 24 alleged 2,4-D complaints compared to 22 dicamba complaints. D046. The article concluded that, across the U.S., "[d]icamba remains the primary source of complaints." *Id.* ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ .

7

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

Nor is there merit to Plaintiffs' contention that EPA's comparison of Enlist to dicamba would permit the Agency to continue approving "worse and worse pesticides and then use these approvals as justification for approving a slightly less harmful pesticide[.]" Pls' Br. 37. This misapprehends FIFRA, which requires EPA to evaluate each registration on its own merits under the statutory standard—*i.e.*, whether the pesticide will cause "unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D). An alternatives analysis is integral to that evaluation, serving to quantify the relative benefits a pesticide provides by assessing the real-world consequences of its removal from the market. *Cf. Ctr. for Food Safety v. Regan*, 56 F.4th 648, 664 (9th Cir. 2022) (describing EPA's assessment of challenged pesticide's toxicity profile compared to alternatives). Those benefits are then weighed against the pesticide's potential adverse effects as part of the statutory cost-benefit determination. *See* 7 U.S.C. § 136a(c)(5)(D). Thus, EPA's comparison of Enlist to dicamba was not a justification for approving a less harmful product, but a reasonable assessment of the agronomic and environmental benefits of Enlist.

Finally, Plaintiffs' assertion that Enlist is "more likely to cause drift damage to nearby crops" compared to generic 2,4-D (Pls' Br. 40) is squarely contradicted by the record. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ EPA's determination that Enlist's off-target risk profile compares favorably

8

to alternatives is therefore amply supported by the record, warrants deference, and well within the range of conclusions a "reasonable mind" would accept. *Open Soc'y Inst.*, 573 F.Supp.3d at 316.

### 2.    EPA reasonably assessed Enlist's benefits to corn crops.

Plaintiffs' challenge to EPA's assessment of Enlist's benefits to corn crops lacks merit. EPA identified the principal alternatives used by corn growers and acknowledged that "the benefits of Enlist 2,4-D products are lower" for corn than for soybean and cotton because corn growers have a wider range of post-emergence options. A029 at 2, 7-8. But EPA identified a discrete benefit of using Enlist on corn: the Enlist trait permits later-season application of 2,4-D than conventional formulations, extending the application window and reducing the risk of crop injury. *Id.* at 7. Plaintiffs' contention that this benefit is illusory because postemergence applications increase off-target risks, Pls' Br. 40, ignores undisputed record evidence that Enlist's 2,4-D choline formulation exhibits a favorable volatility profile compared to conventional formulations and maintains an acceptable drift risk profile when applied in accordance with the label. *See supra* Arg. § I.A.1. EPA's crop-specific benefits assessment is reasonable and well within its discretion under FIFRA.

### 3.    EPA reasonably determined that nonchemical weed control methods are not viable alternatives to Enlist.

Plaintiffs improperly conflate the role of nonchemical weed control practices within an integrated resistance management strategy with their viability as standalone substitutes for herbicide-based control. Corteva does not dispute that nonchemical methods play an important complementary role. *See* Pls' Br. 27. Indeed, the Enlist label expressly recommends that growers "[i]ncorporate non-chemical weed control practices, such as mechanical cultivation, crop rotation, cover crops and weed-free crop seeds, as part of an integrated weed control program." A010 at 11. Non-chemical weed control methods serve a complementary role in resistance management; they are not viable substitutes for herbicide-based weed control. The record demonstrates that non-

chemical methods are inadequate replacements for Enlist because (1) most are preventative and cannot address post-emergence weed pressure; (2) in-crop mechanical cultivation is less effective and more costly than herbicide-based control; and (3) reverting to tillage-based weed control would undermine decades of soil conservation progress.

*First*, herbicide systems such as Enlist remain indispensable for weed control because most nonchemical methods cannot be deployed after crop emergence. As EPA explained, many nonchemical weed control methods "are preventative measures, unlike Enlist," which can be deployed when weeds appear after crop emergence. A028 at 8; *see also* A029 at 7. Plaintiffs identify no nonchemical method capable of providing the post-emergence broadleaf weed control that Enlist delivers in cotton and soybean.

*Second*, even the sole nonchemical method available after crop emergence—in-crop mechanical cultivation—is not a viable substitute. EPA explained that in-crop cultivation "is not able to achieve the same level of control" as herbicide programs because it only controls weeds between rows, not within them; is more difficult to implement; requires more passes across the field, increasing operational and labor costs; and is incompatible with narrow row production systems used in many parts of the U.S. A029 at 7. Plaintiffs offer no response to these findings.

*Third*, EPA explained that the adverse ecological impacts of tillage on soil health render such methods unsuitable replacements for Enlist. *See id*. EPA included no-till and reduced-tillage as label-approved mitigation measures precisely because conventional tillage increases soil erosion, resulting in herbicide, sediment, and nutrient losses through water runoff. *See* A028 at 15. The widespread adoption of reduced-tillage over the past several decades, regarded as among the most significant conservation achievements in modern agriculture, has been possible "in large part because newly developed herbicides could be used to kill weeds and thus replace tillage." D076 at

3; *see also* A028 at 15. Vacating Enlist and requiring growers to revert to tillage as a primary weed control method, as Plaintiffs propose, would undermine these conservation gains.

In sum, far from "ignor[ing]" nonchemical options, Pls' Br. 27, or alternative herbicide systems, *id.* at 38, EPA thoroughly assessed both and reasonably concluded that nonchemical methods are not viable substitutes for post-emergence weed management and available alternative herbicides carry greater environmental risk. EPA's reliance on this analysis to determine that Enlist's benefits outweigh its impacts is reasonable and supported by the record.

**B.     EPA reasonably relied on the best available usage data, and any error was harmless.**

EPA's use of 2018-2019 usage and acreage data to assess Enlist's benefits was reasonable because it was the most reliable data available at the time of the Registration Amendment. EPA Br. 42-43. In any event, any error from EPA's reliance on pre-2020 usage data was harmless because the challenged data informed only EPA's assessment of Enlist's benefits—not its costs or risks—and thus could not have altered the outcome of the Registration Amendment. *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (where agency's mistake "did not affect the outcome" or "prejudice the p[laintiff], it would be senseless to vacate and remand"). Plaintiffs' assertion that reliance on pre-2020 data caused EPA to underestimate the costs of its decision, Pls' Br. 22, has it exactly backwards: if that data undercounted actual usage, the only consequence is that EPA *underestimated* Enlist's benefits, which undermines Plaintiffs' position.

The record confirms that EPA's risk assessments, which drive the cost side of FIFRA's cost-benefit calculus, were entirely independent of the challenged usage data. The Ecological Risk Assessment evaluated risk based on Enlist's maximum single application rate, not acreage data. D016 at 6 ("all exposure and risk modeling" relied on the label's maximum single application rate, allowing three applications per year of .95 lbs acid equivalent 2,4-D/acre). █████████

11

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████.

Plaintiffs have identified no mechanism by which more recent usage data could have changed the outcome of the Registration Amendment. Their "inability to identify how [EPA's Registration Amendment] could have come out differently" had EPA used post-2019 data "defeats their request for vacatur[.]" *Prohibition Juice Co. v. FDA*, 45 F.4th 8, 25 (D.C. Cir. 2022).

## C.     EPA reasonably assessed and mitigated Enlist's impact on weed resistance.

EPA reasonably assessed the potential impact of Enlist use on herbicide resistance through qualitative analysis given the absence of quantitative data and concluded that increased resistance to 2,4-D would likely decrease the benefits of Enlist over time. *See* A029 at 14. Plaintiffs take issue with EPA's characterization of resistance as a reduction in benefit, asserting instead that it is a cost. *See* Pls' Br. 23. Plaintiffs' characterization rests on a misunderstanding of the relationship between herbicide resistance and weed control costs. Resistance to an herbicide does not impose new costs on growers but instead diminishes the weed control benefits the herbicide confers, returning growers to baseline conditions that existed before the herbicide became available. The "costs" Plaintiffs identify—increased weed control expenditures and decreased yields—are costs growers would bear in the absence of Enlist. Resistance thus does not generate an independent cost attributable to Enlist's registration. On this basis, EPA has treated resistance as bearing on the "useful lifespan" of a pesticide—*i.e.*, the duration of its benefits.[4] But however the issue is labeled,

---

[4] *See* EPA, Pesticide Registration Notice 2017-2 (2017),
https://www.epa.gov/sites/default/files/2017-09/documents/prn-2017-2-herbicide-resistance-

what matters is that EPA qualitatively assessed the impact of Enlist on herbicide resistance, and its analysis is supported by the record and easily satisfies the highly deferential review here.

> **1.    EPA's qualitative assessment of Enlist's impact on weed resistance was reasonable in the absence of quantitative data.**

EPA reasonably assessed the potential impact of Enlist on herbicide resistance through qualitative analysis because the quantitative data necessary for a numerical assessment does not exist. Quantifying the costs of resistance would require empirical data establishing the extent to which Enlist use has contributed to 2,4-D resistance. No such data has been developed—because Enlist-attributable resistance has not materially manifested. The record demonstrates that "there were no reports of instances of lack of herbicide efficacy for Enlist herbicides between 2015 and 2020 in annual reports submitted by Corteva or through open literature searches," A021 at 23, and that "the instances of 2,4-D resistance currently confirmed in the U.S. are not associated with the Enlist system," A029 at 12. Thus, there was simply no dataset at the time of the Registration Amendment from which EPA could have derived a quantitative estimate of resistance impacts.

Plaintiffs' reliance on *NFFC* to argue that EPA was required to quantify the costs of weed resistance is misplaced. *See* Pls' Br. 22-26. *NFFC* holds that an agency acts arbitrarily when it ignores or understates costs that available data would permit it to quantify. 960 F.3d at 1138-39. It does not stand for the proposition that an agency must quantify costs for which no quantifiable data exists. In *NFFC*, the Ninth Circuit found that EPA's registration of dicamba was not supported by substantial evidence because EPA failed to quantify or even acknowledge "the amount of damage caused by [over the top] application of dicamba herbicides" despite possessing extensive quantitative data documenting widespread crop damage. *Id.* at 1138, 1144. The court also faulted EPA for disregarding "a great deal of *qualitative* information about extensive dicamba damage"

management.pdf.

in the record. *Id.* at 1138 (emphasis added). No comparable body of evidence exists here. Unlike the dicamba damage at issue in *NFFC*—which was extensive and well-documented at the time of EPA's decision—Enlist-attributable resistance has not meaningfully materialized. EPA did not ignore or understate available evidence but rather assessed all available evidence qualitatively because that was the only methodology the record could support. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) ("It is one thing to set aside agency action under the [APA] because of failure to adduce empirical data that can readily be obtained. . . . It is something else to insist upon obtaining the unobtainable.").

Nor can Plaintiffs credibly contend that EPA failed to grapple with Enlist's impacts on resistance. EPA acknowledged that reported incidents of cross-resistance to 2,4-D from dicamba application lowered the benefits of Enlist "compared to previous EPA benefits assessments" and "pose[d] threat to the potential benefits of Enlist . . . in the future." A021 at 23. But EPA concluded that, "[d]espite this change in benefits," Enlist remains "highly important" for the control of herbicide-resistant weeds, particularly when used with "multiple effective modes of action" ("MOA") and "best management practices" designed to limit further resistance development. *Id.* Among other requirements, EPA established a comprehensive herbicide resistance management plan, requiring Corteva to "educat[e] and train[] retailers, farmers and applicators on the appropriate use" of Enlist to minimize resistance. *Id.* at 41. Corteva must investigate reports concerning the lack of herbicide efficacy, and where likely resistance is identified, engage with growers to contain weed escapes. *Id.* (incorporating herbicide resistance management plan from 2017 Enlist registration). To promptly identify and address any emerging herbicide resistance trends, the Registration Amendment requires Corteva to (1) conduct suspected resistance testing for both 2,4-D and dicamba "to provide [] EPA with information on the frequency of cross-

14

resistance," *id.* at 41; and (2) report grower survey data on how Enlist is used so that EPA can "evaluate grower use of tank-mixing as a tool for resistance management in order to inform future terms and conditions and training/education requirements," A029 at 2. This approach is consistent with the framework upheld in *Migrant Clinicians Network v. EPA*, where the court found that EPA adequately considered and mitigated the risk of resistance by imposing measures to reduce exposure to the at-issue pesticide and requiring registrants to "educate growers on mitigating antibiotic resistance and monitoring … for . . . resistance." 88 F.4th 830, 840-41 (9th Cir. 2023).

EPA's qualitative approach is independently supported by governing agency guidance. Office of Management and Budget ("OMB") Circular A-4, which standardizes how benefits and costs of federal regulatory actions are measured, provides that where an agency cannot "quantify the [cost or benefit] effects," it "should present any relevant quantitative information along with a description of the unquantified effects[.]" OMB, Circular A-4 (Sep. 17, 2023).[5] EPA guidance similarly directs that "[b]enefits and costs that cannot be quantified should be presented qualitatively[.]" EPA, Guidelines for Preparing Economic Analyses at 11-2 (3d ed. 2024).[6]

Controlling case law confirms that agencies act reasonably in employing qualitative analysis where quantitative data is unavailable. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 71 (D.C. Cir. 2019) (qualitative cost-benefit assessment is reasonable where "hard and convincing quantitative data would be difficult to find"); *Sinclair Wyo. Refin. Co. v. EPA*, 101 F.4th 871, 889-90 (D.C. Cir. 2024) (upholding qualitative assessment of non-monetizable costs). Most directly on point, the Ninth Circuit in *Migrant Clinicians Network* held that EPA adequately assessed antibiotic resistance under FIFRA where it qualitatively "accounted for the various pathways by

---

[5] https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4.
[6] https://www.epa.gov/system/files/documents/2024-12/guidelines-for-preparing-economic-analyses_final_508-compliant_compressed.pdf.

which antibiotic resistance might spread" and "sufficiently explained why the risk of increased resistance was not unreasonable based on defined mitigation measures." 88 F.4th at 840; *see also* EPA Answering Br. at 32, *Migrant Clinicians Network v. EPA*, No. 21-7079 (9th Cir. 2023), ECF No. 72 ("EPA conducted a qualitative risk assessment" of antibiotic resistance risk).

So too here. EPA qualitatively assessed the risk that Enlist may contribute to weed resistance, explained why that risk does not render Enlist's effects unreasonable, and imposed mitigation measures—including herbicide resistance management requirements and ongoing monitoring—to address the risk prospectively. Neither FIFRA nor the case law implementing it demands more—nor could more reasonably be required where quantitative data is lacking precisely because there is no evidence of negative impacts on resistance to quantify.

> ## 2. Plaintiffs' arguments that Enlist worsens weed resistance are without merit.
>
> ### a. Plaintiffs' resistance arguments are misleading and the characteristics they attribute to Enlist are shared by its alternatives.

Plaintiffs erroneously assert that Enlist has a singular capacity to accelerate herbicide resistance by (1) increasing resistance to 2,4-D through post-emergence application; (2) conferring cross-resistance to other Group 4 auxin herbicides such as dicamba; and (3) inducing metabolic resistance to herbicides with different MOAs. Pls' Br. 23-26. Each of these assertions is either unsupported by the record and/or applies with equal force to the alternatives that would be used in Enlist's absence. Plaintiffs' arguments thus do not demonstrate that EPA acted arbitrarily, but rather that resistance is an inherent challenge of modern weed management—one that EPA expressly considered and addressed in its comprehensive review.

*First*, Plaintiffs assert that Enlist "*accelerates*" resistance relative to other 2,4-D products because it is predominantly applied after crop emergence. Pls' Br. 23. This argument conflates the

16

timing of herbicide application with the mechanism of resistance development.

Plaintiffs cite no study, and none exists in the record, establishing that post-emergence application accelerates resistance development relative to pre-emergence application of the same herbicide at the same rate.

.

Plaintiffs' argument is belied by the scientific consensus that Enlist's availability as a post-emergence option expands the toolkit for resistance management.

*Second*, Plaintiffs assert that 2,4-D is unlike most other herbicides because it confers cross-resistance to related auxin herbicides such as dicamba. Pls' Br. 25. But this is not a characteristic unique to 2,4-D or the auxin herbicide class. Cross-resistance among herbicides sharing the same MOA is well-documented across multiple herbicide classes, which is precisely why EPA recommends rotating MOAs as a core resistance management strategy.[7]

In any event, Plaintiffs' cross-resistance argument fails on its own terms because EPA expressly accounted for cross-resistance between 2,4-D and dicamba in its cost-benefit analysis. EPA explained that "the benefits to the use of Enlist One . . . have decreased compared to previous EPA benefits assessments" as a result of emerging cross-resistance between dicamba and 2,4-D. A021 at 23. But EPA concluded that, "[d]espite this change" Enlist One "continue[s] to provide

---

[7] *See* EPA, Herbicide Resistance Management PRN 2017-2,
https://www.epa.gov/sites/default/files/2017-09/documents/prn-2017-2-herbicide-resistance-management.pdf.

high benefits for soybean and cotton, and [is] highly important . . . for control of problematic herbicide-resistant broadleaf weeds[.]" *Id.* EPA thus properly considered and rationally addressed Plaintiffs' concern on this front, which is all that is required. *See New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F.Supp.2d 103, 113 (D.D.C. 2010). Further, to monitor changes in Enlist's benefits over time, EPA required Corteva to "test for resistance to both 2,4-D and dicamba in any laboratory or greenhouse trials due to suspected resistance" and report any findings to EPA so it can "develop measures to mitigate the risk of cross resistance in the future." A029 at 13.

*Third*, Plaintiffs contend that EPA failed to fully assess the impact of Enlist on metabolic resistance. Pls' Br. 26. ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████. As set forth below, EPA adequately assessed metabolic resistance and incorporated that assessment into its regulatory framework, and the risk Plaintiffs identify would not be ameliorated by removing Enlist from the market.

Plaintiffs' assertion that EPA failed to assess metabolic resistance is contradicted by the record. EPA acknowledged that metabolic resistance is concerning because it threatens to render problematic weeds immune to multiple herbicide classes. A029 at 11-12. Far from ignoring this risk, EPA incorporated its assessment of metabolic resistance into its qualitative analysis of resistance impacts, concluded that the risk warranted enhanced monitoring and reporting, and imposed concrete regulatory conditions to address it. A021 at 41. Specifically, EPA required Corteva to conduct suspected resistance testing for 2,4-D and dicamba and report "information on the frequency of cross-resistance"[8] to inform future regulatory action should resistance trends

---

[8] ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████.

emerge. *Id.* ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ It is well established that agencies may reasonably act amid scientific uncertainty, and their determinations must be sustained where, as here, the agency provides a reasoned explanation grounded in the best available data. *See e.g., New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005); *Dist. Hosp. Partners v. Burwell,* 786 F.3d 46, 61-62 (D.C. Cir. 2015).

Plaintiffs' projections of catastrophic, cascading resistance—*e.g.*, that Enlist use will produce "rapidly growing populations of intractable weeds that few if any herbicides can kill," Pls' Br. 26—are pure speculation and unsupported by the record. FIFRA does not require EPA to treat worst-case projections as established costs in its cost-benefit analysis; it requires only that EPA assess the risks based on the available evidence and impose appropriate mitigation measures. *See Migrant Clinicians Network*, 88 F.4th at 840. EPA did that here, and its approach more than suffices under the applicable rationality standard. *See Open Soc'y Inst.*, 573 F.Supp.3d at 316.

Moreover, removing Enlist from the market would not materially mitigate the development of metabolic resistance because that issue is not unique to Enlist or even to 2,4-D. As EPA explained, P450 enzyme-mediated metabolism "has been shown to also confer resistance to atrazine, HPPD inhibitor herbicides, and dicamba." A029 at 11; ████████████████. The risk of metabolic resistance is thus inherent in the use of any of these herbicides and would persist regardless of whether Enlist remains available. ████████████████████████

19

████████████████████████████████████████████████████

Accordingly, the practical consequence of Plaintiffs' position is not a reduction in the risk of metabolic resistance, but rather the concentration of grower reliance on a narrower portfolio of herbicides that pose greater environmental risks and offer fewer resistance management options. *See supra* Arg. §§ I.A.1, I.C.1.

### b. EPA's assessment of Enlist's resistance management benefits is supported by the record.

Plaintiffs assert that EPA's conclusion that Enlist will help slow the spread of herbicide-resistant weeds is arbitrary because, according to Plaintiffs, usage data shows growers rarely tank-mix Enlist with other effective MOAs. Pls' Br. 35-36. This argument is not only contradicted by the record but also fundamentally misapprehends the basis for EPA's assessment.

As an initial matter, Plaintiffs' argument rests on the flawed premise that tank-mixing is the sole means of complying with the Enlist label's multi-MOA requirements. Growers can satisfy the multi-MOA objective by applying a pre-emergence herbicide with a different MOA followed by a post-emergence application of Enlist. *See* EPA Br. 24. When these different methods of using multiple MOAs are considered together—as they logically must be—the data confirms that Plaintiffs' fears regarding over-reliance on Enlist are unfounded. *See* A021 at 26 (finding that "fewer than 10% of growers report applying only Enlist herbicide products during the growing season"); ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Further, even setting aside that Plaintiffs' claim that growers do not use multiple MOAs is contrary to the record, EPA supported this aspect of its analysis by explaining that Enlist provides significant resistance management benefits as a standalone chemistry. By offering an effective

20

post-emergence option for control of multiple herbicide-resistant broadleaf weeds, Enlist expands the number of available chemistries and reduces selection pressure on any single MOA used in corn, cotton, and soybean. *See* A029 at 9 ("Enlist provides an effective [MOA] . . . to slow the development of future resistance to other herbicides"); *see also* A021 at 22 (Enlist "provides the only effective postemergence herbicide option to manage these problematic weeds" in some cases). Enlist's resistance management benefits thus exist independently of, and in addition to, any benefits derived from tank-mixing or application in rotation with other MOAs.

Plaintiffs invoke *NFFC* to argue that EPA cannot rely on the Enlist label's multi-MOA requirement to support its resistance management analysis because growers have purportedly "largely ignored" that requirement. Pls' Br. 41 (citing *NFFC*, 960 F.3d at 1139). But *NFFC* is inapposite. In that case, the court found the dicamba labels long, "complex and onerous"; that "many applicators found it difficult or impossible to comply with the 2017 label;" and that the "additional mitigation requirements imposed by the 2018 label would increase the degree of non-compliance." 960 F.3d at 1140-42. The Enlist label's resistance management requirements bear no resemblance to those restrictions. Moreover, the record shows that many growers already use multiple MOAs. *See supra* Arg. § I.C.2.a. To the extent grower adoption of multi-MOA tank-mixing programs has lagged, the appropriate regulatory response—and the one EPA adopted (*see* A029 at 13)—is enhanced education and monitoring, not vacatur of a tool that provides substantial standalone resistance management benefits. *See Migrant Clinicians Network*, 88 F.4th at 840-41 (upholding resistance mitigation framework that included grower education and monitoring).

### c.    *Removing Enlist from the market would accelerate resistance.*

Plaintiffs' resistance arguments, taken to their logical conclusion, would produce the very outcome Plaintiffs claim they want to avoid. Removing Enlist from the market would not slow resistance to 2,4-D but would instead accelerate resistance across multiple herbicide classes by

narrowing the portfolio of post-emergence chemistries available to growers. Without Enlist, growers would have only two primary post-emergence herbicide options for cotton and soybean—dicamba and glufosinate[9]—neither of which offers the resistance management benefits conferred by the Enlist system as the only herbicide-tolerant platform permitting a post-emergence tank mix of 2,4-D choline and glufosinate for post-emergence broadleaf weed control. A029 at 3, 8.

Vacatur would eliminate the tank-mixing benefits that Plaintiffs criticize growers for underutilizing. Unlike Enlist, dicamba cannot be tank-mixed with glufosinate. A029 at 9. Without Enlist, growers would be forced to choose between dicamba and glufosinate for any given application or apply the two sequentially—either of which is inferior to the currently available Enlist-glufosinate tank mix. *Id.* Applying dicamba or glufosinate alone would intensify selection pressure on whichever chemistry is used. ████████████████████████████████ ████████████████████████████████████████████████████ Enlist is the only registered herbicide that can be tank-mixed with glufosinate for post-emergence broadleaf weed control in cotton and soybean, and its removal would foreclose one of the most effective resistance management strategies available. A029 at 9.

Moreover, removing Enlist from growers' arsenal would not slow the development of resistance to 2,4-D because growers' increased reliance on dicamba in Enlist's absence would drive cross-resistance to 2,4-D. As EPA explained, cross-resistance between dicamba and 2,4-D operates bidirectionally, and the continued and increased use of dicamba in the absence of Enlist

---

[9] Conventional 2,4-D is not registered for any use on Enlist crops. The Enlist system was specifically designed to replace conventional 2,4-D with the proprietary choline salt formulation that eliminates the volatility and spray drift concerns inherent in conventional formulations. Conventional 2,4-D likewise cannot be applied over-the-top of non-2,4-D tolerant soybean and cotton, as these crops are sensitive to 2,4-D injury and conventional formulations are not labeled for post-emergence application on these crops. *See* A029 at 3, 8.

would increase resistance not only to dicamba but also to 2,4-D. *Id.* at 13.

In sum, removing Enlist from the market would narrow the portfolio of post-emergence chemistries, eliminate the most effective tank-mixing combination, and accelerate resistance to every remaining alternative—an outcome that neither serves growers nor benefits the environment. EPA's determination that Enlist's continued registration provides net resistance management benefits is a scientific judgment squarely within the Agency's expertise and is entitled to the highest deference. *See Wisconsin*, 938 F.3d at 320.

**D.      The record amply supports EPA's classification of 2,4-D as "Not Classifiable as to Human Carcinogenicity."**

**1.      Animal data supports EPA's Group D carcinogenicity classification for 2,4-D.**

23



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**2.    Epidemiological data supports EPA's Group D carcinogenicity classification for 2,4-D.**

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



. That determination is reasonable, amply supported by the record, and entitled to deference. *See Wisconsin*, 938 F.3d at 320.

### E.   EPA applied its extensive technical expertise and reasonably concluded that the Enlist label sufficiently mitigates the potential for adverse effects.

The Enlist label implements a multi-layered mitigation framework—including spray drift buffers, nozzle restrictions, wind speed and direction requirements to protect sensitive crops, tank mix qualification requirements, mandatory runoff controls, and a credit-based pick list of supplemental runoff mitigation practices—designed to ensure that off-target risks do not rise to the level of unreasonable adverse effects. As set forth below, both the incident data and the structure of these measures, which calibrate additional mitigation requirements to runoff risk factors, confirm that EPA's determination is well-supported by the record and owed deference.

#### 1.   Incident data confirms that the spray drift buffer effectively mitigates effects from potential off-target movement.

After conducting extensive drift modeling of 2,4-D choline, EPA determined that a 30-foot spray drift buffer, combined with nozzle restrictions, effectively "reduce[s] off-field exposures so that spray drift does not pose a risk to non-target organisms." A021 at 25. To maintain the effectiveness of this spray drift buffer, the registration further requires that all approved Enlist tank-mix partners be tested pursuant to EPA's protocol to confirm that they do not adversely affect spray drift properties. *Id.* at 41-42.

27

Plaintiffs contend that the growing number of spray drift incident allegations demonstrates the buffer is ineffective. Pls' Br. 41. The record resoundingly refutes this contention. Incident data from January 2016 to August 2021 shows only 16 reported incidents classified as possibly related to Enlist One or Enlist Duo, EPA_0124286, which EPA explained demonstrates that "incidences of off-target movement [of Enlist] . . . have been relatively rare" as compared to alternatives that have "thousands" of associated incident reports over the same period. A028 at 9.

Unable to find record support for their assertion that the 30-foot spray drift buffer is ineffective, Plaintiffs pivot to the theory that incidents were "significantly underreported" because Enlist use increased while reported incidents decreased. Pls' Br. 42. But even accounting for possible underreporting, EPA reasonably concluded that incidents have been "relatively rare" in comparison to total acres treated and to the thousands of dicamba-related incidents over the same period. A028 at 9. Plaintiffs identify no basis for concluding that underreporting is so substantial as to alter this comparative assessment. Moreover, there is an equally plausible, record-supported explanation for the declining trend: compliance with Enlist label mitigation measures has improved over time, reducing incidents of off-field drift. As a condition of registration, "Corteva must ensure annually . . . that growers . . . receive training and educational materials" on Enlist usage, including instruction on the spray drift buffer, approved nozzle configurations, and other application parameters. A021 at 42. The declining trend in reported incidents is consistent with improved grower adherence to mitigation requirements due to these training programs.

In sum, even accepting some degree of underreporting, the record amply supports EPA's determination that Enlist-related off-target incidents are comparatively infrequent and that the label's spray drift mitigation measures are effective.

    **2.**      **Enlist's runoff mitigation pick list is a reasonable, tailored approach to reducing 2,4-D runoff.**

To determine the runoff reductions necessary to ensure no unreasonable adverse effects to non-target species, EPA evaluated estimated 2,4-D concentrations in terrestrial and wetland habitats and derived a "conservative" reduction target. A022 at 12, 14-15. The Enlist label achieves these reductions through a two-tier mitigation framework. *First*, the label imposes mandatory baseline measures—including prohibitions on application when soil is saturated, or when either rainfall is expected or fields will be irrigated within 48 hours—which alone "result in a substantial reduction in runoff exposure." *Id.* at 15. *Second*, growers must select additional practices from a credit-based pick list, with each practice assigned a credit value reflecting its runoff-reduction capacity. *Id.* Growers must achieve either four or six total credits depending on the field's soil hydrology, thereby calibrating additional mitigation to site-specific runoff risk. *Id.*

Plaintiffs allege that the pick list is arbitrary because it offers optional mitigation measures that "will not achieve any reductions[.]" Pls' Br. 43. This assertion rests on the false premise that the label imposes only optional runoff mitigation, ignoring the mandatory measures described above. The pick list *supplements* those requirements with additional practices calibrated to site-specific conditions and is reasonable precisely because it accounts for the varying efficacy of different practices in reducing 2,4-D runoff across different "soils, site specific terrain, weather, and field management practices." A022 at 15.

Plaintiffs argue that the pick list credits growers without requiring reductions in total applications, and that most growers already satisfy the credit requirements through existing practices. Pls' Br. 43-44. These contentions are unsupported by the record and reflect a misunderstanding of how the credit system operates. FIFRA does not require EPA to impose mitigation that maximizes runoff reduction irrespective of risk; it requires only that mitigation prevent unreasonable adverse effects. *See* 7 U.S.C. § 136(bb). EPA assigned credit values based

29

on application frequency: four credits for one annual application, two for two applications, and zero for the maximum of three. A022 at 22. The system thus functions as a sliding scale, imposing more demanding mitigation on growers with higher application frequencies. Plaintiffs identify no basis for concluding that this risk-proportionate framework is arbitrary or capricious.

Contrary to Plaintiffs' assertion (at 44) that EPA "ignored" application rates in developing mitigation measures, EPA considered and explained why two alternative approaches—reducing single application rates and reducing the area treated—were infeasible. A022 at 22. EPA determined that reducing single application rates could result in the development of resistance. *Id.* And because "[w]eed pressure tends to be dispersed across a field rather than concentrated in one or a few areas," restricting the area treated would prevent growers from achieving effective weed control. *Id.* EPA's decision to credit rather than mandate application reductions thus reflects a reasoned balance of runoff mitigation against effective herbicide use.

Plaintiffs' related assertion that the pick list incentivizes growers to increase the amount of Enlist applied per application to reduce total applications, Pls' Br. 44, is foreclosed by the label. The label prescribes a maximum single application rate of 2 pints/acre and specifies rate recommendations within a narrow range: 1.5 to 2.0 pints/acre for preplant burndown through pre-emergence, and 2.0 pints/acre for postemergence applications. L0025 at 17-21. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██. Because the application rate is capped at the level necessary for effective weed control, the credit system cannot induce growers to apply more Enlist per application in exchange for fewer total applications; the label simply does not permit it. Plaintiffs' contrary speculation is both

agronomically unfounded and irreconcilable with the label's terms. Subsequent applications are made to control weed escapes that emerge after an initial treatment, and thus increasing the rate of an earlier application would serve no agronomic purpose. Plaintiffs identify no record evidence to the contrary, and their theory cannot be squared with the label's binding restrictions, which have the force of law. *See* 7 U.S.C. § 136j(a)(2)(G).

Finally, Plaintiffs allege that the 3-foot vegetative barrier on the pick list is ineffective, citing EPA's determination that turf buffers of five meters or less are ineffective at reducing 2,4-D runoff. Pls' Br. 44 (citing EPA_0014088). This argument conflates two distinct mitigation measures. As EPA explained, the 3-foot vegetative barriers on the pick list are *on-field measures* designed to slow surface water flow and promote infiltration within the treated area, whereas the vegetative filter strips Plaintiffs reference are *off-field* buffers to intercept runoff before it reaches surface water bodies. *See* A022 at 57-58; *see also* EPA Br. 29.

In sum, the Enlist mitigation framework—combining mandatory spray drift buffers, baseline runoff controls, and a credit-based pick list calibrated to site-specific conditions—reflects a reasoned, multi-layered approach that is supported by the record and entitled to deference. Plaintiffs' objections amount to disagreement with EPA's scientific and policy judgments, which is precisely the type of second-guessing that arbitrary and capricious review forecloses. *See New Life Evangelistic Ctr., Inc.,* 753 F.Supp.2d at 113.

## II.    EPA was not required to assess glyphosate's human health risks in issuing the Registration Amendment.

Plaintiffs improperly seek to bootstrap a collateral challenge to EPA's glyphosate registration by arguing that the Enlist label's authorization of tank mixing with glyphosate required EPA to independently reassess glyphosate's human health risks as part of the Registration Amendment. This argument finds no support in FIFRA's text or structure.

31

Section 3(c)(5)(D) requires EPA to determine whether the pesticide undergoing registration "will not generally cause unreasonable adverse effects on the environment"—a determination focused on the active ingredient at issue, here 2,4-D choline. 7 U.S.C. § 136a(c)(5)(D). Nothing in that provision requires EPA to conduct a de novo assessment of the human health risks of a separately registered active ingredient merely because the label of the pesticide under review authorizes tank mixing with products containing that ingredient. Rather, FIFRA authorizes an "ingredient-by-ingredient approach[,]" *NFFC*, 966 F.3d at 917, under which each active ingredient is evaluated through its own registration and registration review proceedings. Plaintiffs' attempt to transform a tank-mix label claim into a vehicle for relitigating the glyphosate registration is inconsistent with FIFRA's framework and should be rejected.[11]

The Ninth Circuit's decision in *NFFC* confirms that EPA's ingredient-by-ingredient approach applies where an herbicide product combines two active ingredients, and thus logically also where the second ingredient is merely an approved tank-mix partner. In assessing the 2017 registration of Enlist Duo, a combination product containing both 2,4-D choline and glyphosate as active ingredients, the court recognized that registration review under section 3(g) is the statutorily prescribed avenue for re-evaluating already-registered active ingredients. *See* 966 F.3d at 918. The court held that EPA was not required to "perform a complete review of the data" for glyphosate in registering Enlist Duo because that registration would not result in any new uses of glyphosate. *Id.* at 917. If EPA had no obligation to conduct a separate human health risk assessment for glyphosate when registering a product in which it was a constituent active ingredient, EPA plainly has no such

---

[11] Contrary to Plaintiffs' assertion (at 31), EPA did not rely on the 2017 Glyphosate Draft Human Health Risk Assessment to permit Enlist One to be tank mixed with glyphosate products. Rather, EPA used it to support the registration of Enlist Duo. Enlist One has hundreds of approved tank-mix partners, including glufosinate, yet the Registration Amendment does not independently assess the human health effects for these other approved tank mix partners. *See* A0021 at 22.

obligation where glyphosate is merely an approved tank mix partner.

FIFRA establishes registration review under section 3(g) as the exclusive mechanism for reassessing whether a previously registered active ingredient continues to satisfy the registration standard. 7 U.S.C. § 136a(g). That process requires EPA to review each registered pesticide every fifteen years. *Id.* § 136a(g)(1)(A). The glyphosate registration review is currently ongoing, and Plaintiffs' challenge to the adequacy of EPA's glyphosate human health risk assessment is thus premature. To the extent Plaintiffs contend that EPA's glyphosate registration is deficient, the appropriate course is to raise that challenge upon completion of that review—not to collaterally attack it through a proceeding concerning a different active ingredient.

Plaintiffs' reliance on *NFFC* to argue otherwise is misplaced. *See* Pls' Br. 33. In *NFFC*, the court stated as dicta that petitioners could challenge the registration of Enlist Duo if EPA authorized it to be tank-mixed with glufosinate, which may result in synergistic effects. 966 F.3d at 921. The court's analysis turned on EPA's failure to assess possible synergistic effects between active ingredients—effects that, if present, would render the ingredient-by-ingredient approach inadequate to capture the product's actual risk profile. *See id.* That concern is absent here. EPA has determined, and Plaintiffs do not dispute, that 2,4-D and glyphosate do not produce greater-than-additive toxicological effects when combined. *See* D065 at 2. The ingredient-by-ingredient approach the Ninth Circuit endorsed thus applies with full force, and there is no basis for requiring EPA to look beyond the active ingredient under review.

III.    **Vacatur is not warranted because any deficiency in EPA's analysis is not serious and vacatur would cause severe disruption to U.S. agriculture and the environment.**

If the Court must address remedy, it should reject Plaintiffs' request for vacatur. Vacatur "need not be the remedy for an invalidly adopted rule." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009). In determining whether vacatur is appropriate, this Court weighs

(1) the seriousness of the agency's errors against (2) the "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted). Both favor remand without vacatur here.

**A.    Any deficiency in EPA's analysis is not serious, and there is at least a serious possibility that EPA will reach the same result on remand.**

Even if this Court found some error in EPA's analysis of Enlist, EPA's determination that Enlist will not cause unreasonable adverse effects rests on multiple independent grounds, and there is thus "at least a serious possibility that" EPA would reach the same result on remand. *Id.* at 151. Indeed, Plaintiffs themselves characterize EPA's purported deficiencies as following an "'acknowledge-but-do-not-actually-assess' theme." Pls' Br. 25. That is precisely the sort of explanatory shortcoming that courts have held does not warrant vacatur because the agency can readily cure it on remand. *See Heartland Reg'l Med. Ctr.*, 566 F.3d at 198.

As discussed above, EPA's comparative assessment is grounded in extensive record evidence showing that (a) there is only one true post-emergence alternative to Enlist; (b) removing Enlist would likely increase reliance on alternatives with a history of significant off-target movement reports; and (c) nonchemical methods cannot substitute for the post-emergence weed control that Enlist provides. *See supra* Arg. § I.A. The depth of this record support confirms that, even if the Court found some error in EPA's assessment of Enlist's benefits, EPA could likely reach the same decision on remand, again concluding Enlist's benefits outweigh its risks. Nor would EPA's reliance on pre-2020 usage data alter the outcome since that data informed only the benefits side of the analysis, while the risk assessments were conducted using maximum application rates. *See supra* Arg. § I.B.

EPA's qualitative assessment of Enlist's impact on herbicide resistance—the only defensible methodology given the absence of quantitative data—is likewise well-supported. As set

forth above, Enlist expands the portfolio of post-emergence chemistries available to growers and enables the only registered tank-mix combination of 2,4-D choline and glufosinate, deploying two distinct MOAs in a single application to reduce selection pressure on any individual chemistry. *See supra* Arg. § I.C.2.b. EPA reinforced this assessment with concrete monitoring and reporting requirements designed to detect and respond to emerging resistance trends. *Id.* Given the lack of record evidence demonstrating that resistance development is attributable to Enlist, there is at least a serious possibility that EPA would reach the same determination on remand.[12]

EPA's carcinogenicity classification for 2,4-D is similarly unlikely to change even if remanded for further analysis. ██████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████. There is thus no reason to think that EPA is likely to reach a different result after further analysis.

In sum, any error Plaintiffs may identify would not be sufficiently serious to warrant vacatur. This is not a case where the agency's explanation is so deficient that the reviewing court cannot discern its reasoning; rather, EPA engaged with each issue and reached conclusions supported by the record. Any shortcoming found will be readily curable on remand, weighing against vacatur. *See Heartland Reg'l Med. Ctr.*, 566 F.3d at 199.

## B.    Vacatur would cause severe agricultural and environmental disruption.

---

[12] As to Plaintiff's argument regarding glyphosate tank mixing, Corteva explained that FIFRA does not require EPA to reassess a separately registered active ingredient's health risks. *See supra* Arg. § II. But even if this Court disagreed, nothing in the record suggests that such additional analysis would change the outcome of the Registration Amendment.

The second *Allied-Signal* factor—whether vacatur would cause "disruptive consequences"—weighs decisively against vacatur. 988 F.2d at 150-51. As the record and Corteva's expert declarations[13] establish, vacating the Enlist registration would inflict severe, cascading harm on growers, the agricultural supply chain, and the environment. *See* Declaration of Tammie Jones-Jefferson ("Jones-Jefferson Decl.") ¶¶37-47; Declaration of Mark M. Loux ("Loux Decl.") ¶¶35-59. The D.C. Circuit has recognized that "disruptive consequences" encompass both economic and environmental harms. *See North Carolina v. EPA*, 550 F.3d 1176, 1177 (D.C. Cir. 2008) (remanding without vacatur where challenged rule provided "enhanced protection" of environmental values); *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (declining to vacate flawed EPA emissions budgets where vacatur would disrupt established trading markets). Both categories of disruption are present here in acute form.

### 1. Vacatur would be disruptive to growers and U.S. agriculture.

Since Enlist One's initial registration in 2017, grower adoption has expanded dramatically, with Enlist-tolerant traits now incorporated into more than 65% of U.S. soybean acreage. Loux Decl. ¶35. Depriving growers of this critical weed management tool would inflict immediate and severe agronomic and economic harm.

Vacatur would strip growers of an effective post-emergence weed control tool at a time when the most damaging broadleaf weed species have developed widespread resistance to other commonly used chemistries. Loux Decl. ¶18; Jones-Jefferson Decl. ¶¶23-24. Field studies consistently demonstrate Enlist's efficacy, achieving 95-100% control of waterhemp and Palmer

---

[13] In deciding the appropriate remedy for any agency error, this Court may consider extra-record declarations, which Corteva provides with this brief. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (explaining extra-record material is allowed "in cases where relief is at issue"); *see also Eco Tour Adventures, Inc. v. Zinke*, 249 F.Supp.3d 360, 369 n.7 (D.D.C. 2017) (considering extra-record material for purposes of remedy).

amaranth when deployed as part of an integrated weed management program. Loux Decl. ¶¶24, 26. Enlist is also the only herbicide-tolerant platform that permits tank-mixing of 2,4-D choline with glufosinate in a single post-emergence pass—a combination that university research and extension specialists consistently identify as the most effective option for controlling resistant broadleaf weeds. *Id.* ¶¶22-23, 34. Without Enlist, growers would face increased weed escapes and yield losses that can reach 80% or more for soybean and 92% or more for cotton in the presence of uncontrolled Palmer amaranth. *Id.* ¶¶44-45. Because waterhemp and Palmer amaranth can each produce over one million seeds per plant, "even a handful of uncontrolled plants in a single season can replenish the soil seedbank sufficiently to sustain or intensify weed pressure for years." *Id.* ¶47; *see also* Declaration of Todd Gaines ("Gaines Decl.") ¶47.

The disruption would be compounded by dicamba's use restrictions for over-the-top applications on dicamba-tolerant soybean and cotton, which constrain growers' ability to apply the herbicide when weed pressure demands timely intervention. Dicamba labels restrict application to the period between one hour after sunrise and two hours before sunset and, in certain states, prohibit application altogether when temperatures exceed 85°F. Loux Decl. ¶¶30-32. These constraints, combined with dicamba's mandatory 240-foot downwind buffer, narrow the application window and render portions of fields untreatable, creating zones of uncontrolled weed growth. *Id.* ¶¶30-31. Dicamba also requires annual applicator training, use of drift and volatility reduction agents, and extensive recordkeeping, further increasing operational costs. *Id*. ¶¶29, 32.

Vacatur would also impose severe economic harm on growers who have structured their operations around the Enlist system. Seed selection, herbicide procurement, and crop rotation sequencing are interdependent decisions requiring multi-season planning; growers typically commit to seed varieties and corresponding crop protection products six to twelve months before

37

planting, often through binding purchase agreements. Jones-Jefferson Decl. ¶¶40-42; Loux Decl. ¶¶38, 40-41. Vacatur would strand growers who have already committed to Enlist-tolerant seed, leaving them with no registered 2,4-D product for over-the-top application. *See* Brief of Amici Curiae American Soybean Association, National Cotton Council, and National Corn Growers Association, Dkt. No. 99 ("Growers' Br.") 17. Even a prospective vacatur effective at the start of the next growing season would disrupt growers' operations, as securing alternative seed, renegotiating supply agreements, and restructuring crop rotations require lead times that extend well beyond a single season. Jones-Jefferson Decl. ¶41; Growers' Br. 17. The disruption would cascade beyond individual growers to the broader agricultural supply chain, including retailers, distributors, seed companies, and custom applicators who have invested in equipment and training specific to the Enlist system. Loux Decl. ¶43. Given these far-reaching consequences, this Court should decline to vacate the registration if it finds any error. *Regan*, 56 F.4th at 668 (remanding without vacating pesticide registration where vacatur would disrupt "many agricultural sectors").

Additionally, vacatur would produce severe, long-term harm by accelerating resistance evolution. Removing Enlist would concentrate selection pressure on the few remaining post-emergence chemistries—principally dicamba and glufosinate—and eliminate the Enlist-glufosinate tank mix, the most effective resistance management tool available for broadleaf weed control in cotton and soybean. *See supra* Arg. § I.C.2.c; Loux Decl. ¶¶49-51; Gaines Decl. ¶¶48-49. Because dicamba cannot be tank-mixed with glufosinate, growers forced onto dicamba-based systems would either bear the cost of separate applications or forgo the second MOA entirely, intensifying selection pressure on fewer chemistries and accelerating resistance across multiple herbicide classes. Loux Decl. ¶29. The resulting loss of herbicide efficacy would increase weed escapes and reduce crop yields, while resistant weed populations build "a long-term reservoir of

38

seeds carrying resistant traits" from which resistant genotypes "will continue to emerge across multiple subsequent growing seasons." Gaines Decl. ¶51; *see also* Loux Decl. ¶¶47-48.

Finally, vacatur would inflict significant economic harm on Corteva, which along with its predecessor invested substantial resources to develop, register, and commercialize both the Enlist herbicide and the complementary Enlist-tolerant seed technology. Jones-Jefferson Decl. ¶¶14-15. Vacatur would eliminate the revenue streams reasonably expected over the useful life of Enlist, undermining Corteva's ability to recoup those investments and diminishing the approximately eight percent of annual net sales that Corteva reinvests in developing next-generation crop-protection tools. *Id.* ¶¶45-47. These harms independently support remand without vacatur. *See Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (weighing economic impact to intervenor-respondent and remanding without vacating challenged license).

### 2. Vacatur would cause adverse environmental impacts.

Courts have declined to vacate where doing so "would at least temporarily defeat . . . the enhanced protection of the EPA rule at issue." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188 (D.C. Cir. 2017). That includes situations where the at-issue pesticides were found to have a "more favorable toxicological profile compared to currently registered alternatives." *Id.* at 189; *see also Regan*, 56 F.4th at 668.

That is precisely the case here. Enlist's choline salt formulation is "specifically engineered to minimize volatility" and exhibits "near-zero volatility under field conditions, effectively eliminating vapor-mediated off-target movement." Loux Decl. ¶28. EPA-mandated buffers—30 feet for Enlist and 240 feet for dicamba—reflect this reduced off-target risk profile. *Id.* ¶¶27-28. Incident data further underscores this contrast; only 16 incidents were classified as potentially caused by Enlist One or Enlist Duo between January 2016 and August 2021, compared to thousands of dicamba-related incidents over the same period. A028 at 8-9. Growers who currently

use Enlist for pre-plant burndown across various crops and over-the-top application in corn would also be forced to revert to conventional 2,4-D formulations, which lack the choline salt's volatility and drift advantages and are restricted to earlier growth stages in corn, making them an incomplete substitute. Jones-Jefferson Decl. ¶¶21, 40. Vacatur would thus eliminate the environmental protections that Enlist's superior drift and volatility profile provides.

Vacatur would also undermine decades of soil conservation progress. Over-the-top herbicides like Enlist are integral to the conservation tillage practices now employed on approximately 76% of corn acres and 74% of soybean acres nationwide, and which improve soil health, reduce greenhouse gas emissions, and minimize nutrient runoff to waterways. Growers' Br. 11-12; *see also* Loux Decl. ¶52. These conservation gains were made possible "in large part because newly developed herbicides could be used to kill weeds and thus replace tillage." D076 at 3. Without Enlist, growers could be forced to increase their reliance on tillage for weed management—a practice that degrades topsoil, increases susceptibility to wind and water erosion, and contaminates waterways. Loux Decl. ¶52; A029 at 7; *see also* A028 at 15, 19.

In sum, vacatur would strip growers of a critical weed management tool, concentrate selection pressure on chemistries with greater off-target risks, accelerate resistance across multiple herbicide classes, and reverse decades of soil conservation progress—consequences that far exceed the disruption threshold courts have recognized as weighing decisively against vacatur. *See Ctr. for Biological Diversity*, 861 F.3d at 188-89; *Regan*, 56 F.4th at 668. Should the Court identify any deficiency in EPA's analysis, the appropriate remedy here is remand without vacatur to preserve the substantial environmental and agronomic benefits of Enlist's registration.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Corteva's cross-motion for summary judgment.

40

Dated: July 23, 2026                    Respectfully submitted,

                                        /s/ Kirsten L. Nathanson
                                        Kirsten L. Nathanson (DC Bar No. 463992)
                                        Amanda Shafer Berman (DC Bar No. 497860)
                                        Lynn T. Phan (DC Bar No. 1738637)
                                        CROWELL & MORING LLP
                                        600 Fifth Street, N.W.
                                        Washington, D.C. 20001
                                        (202) 624-2500
                                        KNathanson@crowell.com
                                        ABerman@crowell.com
                                        LPhan@crowell.com

                                        *Counsel for Defendant-Intervenor*
                                        *Corteva Agriscience LLC*

41

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2026, a copy of the foregoing **Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment** was filed electronically through the Court's CM/ECF system and sent via e-mail to Counsel for Plaintiffs and Federal Defendants at the email addresses listed below:

Cameron Hinojos
Trial Attorney
Environment & Natural Resources Division
Department of Justice
P.O. Box 7611
Washington, DC 20044
(202) 305-5885
cameron.hinojos@usdoj.gov

*Counsel for Federal Defendants*

Kristina Sinclair (CA329416)
CENTER FOR FOOD SAFETY
600 California Street, Suite 12-013
San Francisco, CA 94108
(415) 826-2770
ksinclair@centerforfoodsafety.org

*Counsel for Plaintiffs*

*/s/ Kirsten L. Nathanson*
Kirsten L. Nathanson

**CERTIFICATE OF COMPLIANCE**

In accordance with the Court's Order granting the intervention motion of Corteva Agriscience, LLC ("Corteva") (ECF #37; 03/26/24), the below undersigned counsel certifies that Corteva met and conferred with Defendants during the development of the summary judgment briefs. Since the Court's Order granting intervention, the parties jointly submitted a proposed summary judgment briefing framework for separate and staggered briefs for Defendants and Corteva (ECF #54; 05/07/25), which the Court granted, providing a 40-page limit for Corteva's summary judgment brief (ECF #55; 05/07/25). Corteva's separate filing of its summary judgment motion and response to Plaintiffs' summary judgment motion is in accordance with the Court's Order (ECF #54) and subsequent Orders amending the briefing schedule (ECF #72, 75, 89, 96). Consistent with the Court's intervention Order, Corteva needs a separate filing to advance arguments related to its "clear, legally protectable interest in this action, specifically an interest in the property that is the subject of this litigation: the registration[ ] for Enlist One . . . ." (ECF #37 at 8). Corteva's separate filing seeks to "avoid unnecessary duplicative briefing" (*id.* at 10) and offers Corteva's positions on the Plaintiffs' arguments related to both the administrative record and the requested remedy. Corteva has worked to supplement and complement, and not repeat, the Defendants' arguments.

/s/ *Kirsten L. Nathanson*
Kirsten L. Nathanson
Crowell & Moring LLP
600 Fifth Street, NW
Washington, DC 20001
Ph: (202) 624-2887
knathanson@crowell.com

*Counsel for Corteva Agriscience, LLC*