**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR FOOD SAFETY, *et al*.,

      Plaintiffs,

   v.

ENVIRONMENTAL PROTECTION AGENCY, *et al*.,

      Defendants,

and

CORTEVA AGRISCIENCE, LLC,

      Defendant-Intervenor.

Case No. 1:23-cv-1633

**DECLARATION OF MARK M. LOUX, Ph.D.**

I, Mark M. Loux, hereby declare as follows:

## EXECUTIVE SUMMARY

1.      This declaration addresses the critical importance of the Enlist system—which enables postemergence application of 2,4-D choline and glufosinate in tolerant soybean and cotton—for managing the most damaging and herbicide-resistant weed species in U.S. row crop agriculture.

2.      Waterhemp, Palmer amaranth, giant ragweed, and horseweed are the most troublesome weeds in soybean and cotton production due to their rapid growth rates, prolific seed production, extended germination periods, and propensity to develop resistance to multiple herbicide modes of action. Growers have an extremely narrow set of effective postemergence control options for these weeds, which includes 2,4-D, dicamba, and glufosinate.

3.      The Enlist system also offers a flexible and effective control option that is not subject to certain use restrictions applicable to dicamba, nor is its efficacy variable and dependent on environmental conditions in the manner that limits the reliability of glufosinate applied alone. It is also uniquely valuable because it permits tank mixing 2,4-D choline and glufosinate, which is widely regarded as the most effective postemergence control option in cotton and soybean crops.

4.      Enlist One possesses a favorable environmental profile, as the choline salt formulation of 2,4-D exhibits near-zero volatility and reduced risk of spray drift under field conditions, materially reducing the risk of off-target movement and injury to neighboring crops and sensitive areas relative to dicamba-based alternatives.

5.      Vacatur of the Enlist One registration would cause severe and cascading harms, including immediate economic losses from stranded seed and equipment investments, increased crop yield losses from diminished weed control, rapid replenishment of the soil weed seedbank,

1

accelerated development of herbicide resistance to the few remaining effective chemistries, increased reliance on tillage with attendant soil erosion and environmental degradation, and the erosion of integrated weed management programs that depend on effective herbicide options.

## BACKGROUND AND EXPERIENCE

6.     I started my educational and professional career in agronomy 45 years ago. I earned my B.S. in plant science in 1981 from the University of Delaware and my M.S. and Ph.D. in agronomy (weed science) in 1985 and 1988, respectively, from the University of Illinois. My research during my graduate education focused on the efficacy and interaction with soil of several soybean herbicides that received registration in the mid to late 1980s (i.e. imazaquin, imazethapyr, and clomazone). I was also responsible for soybean herbicide trials conducted at an outlying research station in southern Illinois.

7.     I retired from my role as Professor Emeritus in the Department of Horticulture and Crop Science at Ohio State University in 2022. Before that, I held other positions at Ohio State University, including Professor from 2005 to 2022, Associate Professor from 1994 to 2005, and Assistant Professor from 1987 to 1994. Throughout that entire period, I also held the role of Extension Agronomist.

8.     My focus at Ohio State University was on research and extension education in agronomic crops, pasture, and non-crop areas. My overall focus was as a primary provider of research-based information on weed and herbicide management to Ohio agribusiness and growers. My work included the evaluation of new herbicides and herbicide systems, weed management strategies for conservation and no-tillage, and the development of systems for management of herbicide-resistant weeds.

2

9.      As a result of my work, I developed the extension bulletin "Ohio Weed Control Guide," which served as a primary reference for clientele and growers in the Midwest. It was later adopted by several other states to become the "Ohio, Indiana, Illinois, Missouri Weed Control Guide." I have published more than 45 peer-reviewed journal articles, including in journals such as Weed Science, Plant Disease Scientific Reports, and Weed Technology.

10.     My extension activities focused on making my research and expertise on weed and herbicide management available to agribusiness and growers. I conducted on-site farm visits to diagnose problems, solve problems, and make recommendations, as well as provide on-farm consulting. This consulting work would often include my assessment of the crops at issue, the weeds or other environmental factors impacting weed control and crop yield, and my recommendations for the type of herbicides that could be used in combination or alone, as well as recommendations on timing of application and additional integrated pest management tools the farm could consider employing.

11.     I have given over 1,000 presentations around Ohio and surrounding states to growers, agribusiness, county extension personnel, and soils conservation personnel. I have also collaborated with weed scientists in the Midwest to develop resources on weed management, herbicide resistance, and herbicide stewardship. I also served as part of the leadership of the Ohio State University Agronomic Crops Team, an OSU Extension multi-disciplinary group of state specialists, field specialists, and county educators that conducted on-farm research, workshops, and surveys, and developed and maintained the OSU Crop Observation and Recommendation Newsletter (C.O.R.N.).

3

## I.    WEED MANAGEMENT CHALLENGES IN COTTON AND SOYBEAN

12.    The major weed problems that soybean and cotton growers currently face are the result of several decades of selection based on trends in crop production and farm size and economics, and herbicide use. The trend for more effective herbicides and herbicide-tolerant crop technology has resulted in uniformly better control of many weeds. At the same time, growers have been selecting for weed species that are well adapted to their tillage (i.e., mechanical disturbance of soil to uproot and bury weeds) and production practices, including horseweed (*Erigeron* canadensis), giant ragweed (*Ambrosia trifida*) and especially two weeds in the pigweed family, waterhemp (*Amaranthus tuberculatus*) and Palmer amaranth (*Amaranthus palmeri*). These weeds also have a propensity to develop resistance to multiple herbicide sites of action due to their inherent continually evolving variation, and continued selection by the herbicides that have activity on them. These are the weeds that are currently driving weed management and herbicide use decisions, with waterhemp and Palmer amaranth as the foremost concern. Understanding the biology and adaptability of these weeds is essential to appreciating why the loss of any effective herbicide option—particularly one as critical as Enlist One—would have severe consequences for growers.

13.    Waterhemp, Palmer amaranth, giant ragweed, and horseweed possess biological characteristics that make them particularly difficult to control and well-adapted to modern crop production systems. These weeds thrive in both conventional tillage and no-till systems, as they do not depend on soil disturbance to germinate and can exploit the conditions created by any tillage regime. These weeds also have extended and staggered germination periods, producing new flushes of seedlings from spring well into summer, which means that no single herbicide application can control all emerging plants and a multiple-application strategy is required.

4

14.     These weeds are also capable of rapid growth of up to three inches per day, allowing them to overtop the crop canopy and deprive the crop of the light and resources necessary for normal development, directly reducing yield potential (Webster et al., 1994). Such rapid growth also allows weeds to exceed the height at which herbicides are effective. Palmer amaranth and giant ragweed can readily reach four to six feet by mid-season (Growiwm.org), which, in addition to inhibiting crop growth and reducing yield, interferes with mechanical harvesting equipment, causing delays, increasing wear on machinery, and resulting in additional economic losses for growers.

15.     The proliferation of these weeds has been due also to their propensity to develop resistance to the many herbicides that are effective on them, especially waterhemp and Palmer amaranth. Waterhemp and Palmer amaranth also have separate male and female plants—meaning that every seed is the product of cross-pollination between two different parent plants. This obligate cross-pollination generates exceptional genetic diversity within and among populations, which in turn provides a broad genetic base from which resistance traits and other adaptive characteristics can rapidly emerge and spread.

16.     These weeds developed resistance to Group 2 herbicides (ALS inhibitors)[1] and Group 9 herbicides (glyphosate) starting in the 1990s and 2000s, respectively. Glyphosate-tolerant soybeans and cotton were widely adopted because the tolerant trait allowed growers to apply glyphosate postemergence—that is, after the crop and weeds have emerged from the soil—

---

[1] Herbicides are classified into numbered groups based on their mode of action—i.e., the specific biochemical process or enzyme system within the plant that the herbicide targets and disrupts. Herbicides sharing the same mode of action are assigned to the same numbered group. This classification system, maintained by the Weed Science Society of America, is used to guide herbicide rotation and resistance management, as weeds that develop resistance to one herbicide within a group are typically cross-resistant to other herbicides in the same group.

to control actively growing weeds during the season without injuring the crop. Once resistance to glyphosate became prevalent in these weed species, however, glyphosate-tolerant varieties provided no additional control options over conventional crop varieties. This left no postemergence herbicide options for control of horseweed and only partially effective options for giant ragweed.

17.     Giant ragweed and horseweed have largely not developed resistance to the herbicides that are currently effective for foliar control—2,4-D (Group 4), dicamba (Group 4), and glufosinate (Group 10).

18.     Waterhemp and Palmer amaranth have continued to evolve resistance to additional herbicide sites of action at an accelerating pace. Weed populations resistant to multiple modes of action are now widespread, driven in part by enhanced metabolic resistance, a mechanism by which the plant degrades herbicide molecules before they can reach their target site. This mechanism can confer cross-resistance to herbicides across multiple sites of action simultaneously, resulting in considerable and often unpredictable variation among populations. The breadth and unpredictability of metabolic resistance underscores the critical importance of preserving every remaining effective herbicide option, as the loss of any single tool concentrates selection pressure on the diminishing number of alternatives. Waterhemp populations in Illinois have been confirmed with resistance to as many as eight sites of action, including Groups 2 (ALS inhibitors), 4 (synthetic auxins), 5 (PSII inhibitors), 9 (glyphosate), 10 (glufosinate), 14 (PPO inhibitors), 15 (very long-chain fatty acid synthesis inhibitors), and 27 (HPPD inhibitors). However, confirmed resistance to Group 4 herbicides such as 2,4-D and dicamba and to Group 10 herbicides such as glufosinate each remains uncommon relative to resistance to other sites of action and limited in geographic scope. Accordingly, 2,4-D choline continues to provide effective

6

postemergence control of waterhemp and Palmer amaranth across most infested acres, and the tank mix of 2,4-D choline and glufosinate—which combines two herbicides with distinct and independently effective modes of action—remains the most reliable postemergence option available. The value of this combination lies precisely in the fact that the probability of any single weed population having simultaneously developed resistance to both Group 4 and Group 10 herbicides is substantially lower than the probability of resistance to either alone.

## II.    CRITICAL IMPORTANCE OF THE ENLIST SYSTEM FOR WEED CONTROL AND RESISTANCE MANAGEMENT

19.     Given the extent of herbicide resistance described above, effective postemergence control of these four weeds in soybeans and cotton is now achievable only through the use of herbicide-tolerant crop technology paired with the specific herbicides enabled by those traits. At present, only two such systems exist: the Enlist system, which permits postemergence application of 2,4-D choline, glufosinate, and glyphosate in 2,4-D-tolerant crops; and the XtendFlex system, which permits postemergence application of dicamba, glyphosate, and glufosinate in dicamba-tolerant crops. No other herbicide-tolerant trait platform currently provides postemergence control of waterhemp, Palmer amaranth, giant ragweed, and horseweed in these crops. While both systems include herbicides that are agronomically effective against these weed species, the two systems differ in their use requirements and application parameters: the Enlist system can be deployed with fewer operational constraints, lower off-target risk, and greater application flexibility than leading alternatives.

### A.    Uniquely Effective Weed Control in Soybean and Cotton

20.     The 2,4-D choline component of Enlist One is one of the few remaining herbicide active ingredients and modes of action available for postemergence control of multiple-herbicide-resistant broadleaf weeds in cotton and soybean.  As described above, the progressive

7

loss of herbicide efficacy due to resistance evolution has left growers with an extremely narrow set of postemergence options, making each remaining effective chemistry indispensable.

21.    Growers, applicators, and weed scientists are highly familiar with 2,4-D due to its long history of effective use across a wide range of cropping situations. Weed management guides published by land grant universities—the primary public institutions responsible for agricultural research and extension education in each state, and the authoritative source of independent, research-based weed management recommendations for growers—consistently rate 2,4-D choline as providing good to excellent control of the broadleaf weed spectrum encountered by soybean and cotton growers, including herbicide-resistant populations (Barber et al., 2026; Dewerff et al., 2025; Essman et al., 2026; Everman 2025; Sprague and Burns 2026; Steckel 2026). As a Group 4 (synthetic auxin) herbicide, 2,4-D choline operates through a distinct mode of action that remains effective against broadleaf weeds that have developed resistance to other herbicide groups, provided it is integrated into the comprehensive herbicide program necessary for a given weed species and population.

22.    Extension specialists emphasize that growers should not rely on postemergence herbicides, including Enlist One, alone to control waterhemp and Palmer amaranth. Instead, they consistently recommend applying a residual herbicide preemergence (i.e., before weeds emerge from the soil) followed by postemergence applications of 2,4-D choline as part of a multi-application, multiple-site-of-action program. Extension specialists stress the need to apply postemergence herbicides when weeds are small—less than three to four inches in height—and highlight the efficacy of a tank mixture of 2,4-D choline and glufosinate where weeds are larger or present in denser populations, as well as the benefit of this combination for herbicide

8

resistance management (Barber et al., 2025; Growiwm.org; Legleiter 2020; Sprague and Burns, 2026).

23.     Critically, the Enlist system is the only herbicide-tolerant platform in soybean that permits the tank-mix application of two independently effective broadleaf herbicides in a single postemergence pass. Continued availability of the Enlist system is therefore essential to prevent weed control failures, protect crop yields, and avoid the escalation of weed infestations that would result from diminished postemergence efficacy.

24.     University research confirms the efficacy of 2,4-D choline when used postemergence within the herbicide program outlined above—residual herbicides applied at planting followed by one or two postemergence applications targeting emerged weeds. Studies conducted from 2021 to 2023 in Minnesota demonstrated that this sequential approach achieved 95 to 97% control of waterhemp and prevented weeds from causing yield loss where 2,4-D choline was included in at least one of two postemergence applications (Singh et al., 2025a; Singh et al., 2025b). Where 2,4-D choline was used in a second postemergence application, control remained at or above 95%. Critically, this level of control reduced waterhemp seed production to zero at two of the three study locations, which in turn reduced waterhemp emergence the following year by 72 to 92%. These studies demonstrate that effective postemergence use of 2,4-D choline not only protects current-season yields but also diminishes future weed pressure by depleting the soil seedbank.

25.     Similarly, in a 2018–2019 Nebraska study, postemergence application of 2,4-D choline and/or glufosinate on Palmer amaranth achieved 92% control and a 91% reduction in population density and prevented weeds from causing yield loss (Shyam et al., 2021).

26.      In a 2013–2015 study in Texas high plains cotton, this sequential approach achieved 95 to 100% control of Palmer amaranth, leading the authors to conclude that herbicide systems containing 2,4-D choline were among the most effective evaluated (Manuchehri et al., 2017).

**B.      Enlist One's Benefits Compared to Available Alternatives**

1.      Dicamba

27.      The 2,4-D choline formulation used in Enlist One possesses an enhanced safety profile compared to dicamba with respect to both vapor volatility and spray particle drift—the two principal pathways of off-target herbicide movement. Volatility—the tendency of a herbicide to evaporate from treated surfaces and move as vapor to non-target areas—has been a source of off-target crop injury concerns associated with postemergence herbicide use in recent years. EPA has noted that dicamba is prone to volatilization, and that despite lower-volatility formulations and label requirements mandating the addition of volatility reduction agents, off-target movement events occurred across multiple states and growing seasons, causing damage to sensitive crops, including non-tolerant soybeans, specialty crops, trees, and other vegetation (EPA 2020).

28.      In contrast, the choline salt formulation of 2,4-D used in Enlist One was specifically engineered to minimize volatility. Published research and EPA's own assessment have confirmed that 2,4-D choline exhibits near-zero volatility under field conditions, effectively eliminating vapor-mediated off-target movement as a practical concern (EPA 2014). With respect to spray particle drift, both Enlist One and dicamba labels impose droplet size and nozzle requirements to reduce physical drift. The Enlist One label, however, requires only a 30-foot downwind buffer to sensitive crops, whereas dicamba labels mandate buffers of up to 240 feet,

along with additional wind speed, temperature, and time-of-day restrictions that narrow the window for compliant application. The cumulative effect of these differences is that the Enlist system enables growers and applicators to achieve effective postemergence weed control with lower risk of off-target injury to neighboring crops and sensitive areas than is achievable with any dicamba-based program.

29.    Dicamba use is subject to additional operational requirements that have no parallel in the Enlist system. Dicamba requires annual applicator training—a requirement that does not apply to Enlist One—and imposes restrictions on weather conditions, buffer distances, and adjuvant use (EPA 2026). Dicamba must be tank-mixed with both drift reduction agents and volatility reduction agents at every application, adding cost and complexity. The dicamba label prohibits mixing dicamba with glufosinate or with ammonium sulfate, an additive routinely used to ensure glyphosate activity where carrier water contains elevated mineral content (the tank mix of dicamba and glyphosate is common in dicamba tolerant crops). Growers using dicamba would therefore be unable to combine their primary broadleaf herbicide with glufosinate in a single pass—the tank-mix combination available in the Enlist system. Instead, these two products must be applied in separate passes, requiring additional application costs and field operations. Sequential application also creates timing considerations: initial postemergence applications typically occur in mid-June, before the crop reaches early bloom. A second application several weeks later may not be possible before the crop exceeds the allowable growth stage or before weeds have grown beyond the size at which herbicides are effective. Use of dicamba in the second application would also occur later in summer, when higher temperatures may increase volatility concerns and reduce the number of hours meeting label application requirements.

11

30.     Wind speed, temperature, and time-of-day restrictions on dicamba further compound the difficulty of using it as a replacement for Enlist. Dicamba labels restrict application to wind speeds between three and ten miles per hour (MPH), as speeds below 3MPH may indicate temperature inversions that promote lateral vapor movement, while speeds above 10MPH increase spray particle drift (EPA 2026). In practice, wind conditions in major soybean- and cotton-producing regions frequently fall outside this range for substantial portions of the day. Temperature cutoffs further affect the application window: while the federal EPA label restricts spraying to 50% of acreage when ambient temperatures range between 85°F and 95°F, some states, including Minnesota and Illinois, prohibit over-the-top dicamba application when temperatures exceed 85°F (Jenkins 2026)—a threshold frequently surpassed in June when postemergence herbicides must be applied. The dicamba label also requires applications between one hour after sunrise and two hours before sunset (EPA 2026). The combined effect of these requirements eliminates many available working days during the window when weeds are small enough to be controlled.

31.     Beyond these temporal and meteorological constraints, the dicamba label imposes a mandatory 240-foot downwind buffer (EPA 2026) that may render portions of fields untreatable, requiring growers to develop and implement an alternative herbicide program for those buffer areas. Where effective alternative herbicides are unavailable due to resistance, these untreated zones may become sources of weed seed production that affect control efforts across the field. The aggregate effect of these restrictions is that dicamba cannot be applied with the speed, flexibility, or field coverage that effective weed management demands.

32.     EPA has documented a history of off-target movement complaints associated with dicamba use in tolerant crops. In the years following the initial registration of dicamba for over-

the-top use in tolerant crops, state departments of agriculture across the Midwest and South received thousands of complaints of dicamba-related damage (EPA 2020). Following a period where this use was not permitted, the over-the-top registration was renewed for 2026 with additional label restrictions (EPA 2026). The recordkeeping requirements that dicamba labels impose—including mandatory documentation of weather conditions, wind speed and direction, air temperature, adjacent crop types, and proximity to sensitive areas, as well as consultation of sensitive crop registries before each application—represent operational requirements that growers and custom applicators must incorporate into their application planning. Compliance with all label requirements while treating sufficient acreage in a timely manner may present challenges, particularly for large-acreage growers who must apply postemergence herbicides before weeds exceed treatable size and before the crop reaches the maximum allowable growth stage or state-imposed cutoff date—which can be as early as June 12 in some states (Jenkins 2026).

## 2.    Glufosinate

33.    Although glufosinate poses minimal off-target risk, it is a contact herbicide for which efficacy is substantially more variable and condition-dependent than that of 2,4-D choline, requiring more thorough spray coverage and adequate temperature and sunlight intensity to achieve lethal activity. Under suboptimal conditions—such as cool temperatures, cloud cover, or low relative humidity—glufosinate's ability to control key weed species can decline substantially, often falling below commercially acceptable levels (Landau et al., 2025). For this reason, extension specialists often recommend mixing glufosinate with ammonium sulfate to improve absorption and uptake. Moreover, weed size affects glufosinate efficacy more acutely than it does for 2,4-D choline or dicamba, with control declining markedly on weeds exceeding

13

three inches in height—a threshold that waterhemp and Palmer amaranth can surpass relatively quickly after emergence, given their rapid growth rates (Growiwm.org).

34.     University field trials have consistently confirmed that the tank mix of 2,4-D choline and glufosinate provides materially superior control compared to glufosinate applied alone, and for this reason 2,4-D choline is routinely added to glufosinate applications. The combined activity of the tank mix also provides a broader and more reliable window of effective control than either product alone—given that weeds can quickly surpass the maximum size thresholds specified on herbicide labels (three inches for glufosinate and six inches for Enlist One)—substantially reducing the likelihood of weed escapes and often eliminating the need for a second postemergence application that would be difficult to implement before weeds exceed treatable size. No other currently available herbicide combination provides this level of efficacy, operational efficiency, and resistance management benefit in a single postemergence application.

### III.    CONSEQUENCES OF VACATING THE ENLIST ONE REGISTRATION

35.     Given the widespread adoption of the Enlist system—with Enlist-tolerant traits now incorporated into over 65% of soybean acreage (Corteva Agriscience 2026) and a substantial share of cotton acreage across the United States—the critical importance of the 2,4-D choline/glufosinate tank mix, the limited effectiveness of glufosinate alone on larger weeds, and the operational requirements associated with dicamba use described above, loss of Enlist One in cotton and soybeans would result in severe and immediate consequences.

36.     Effective weed management in soybean and cotton requires the use of an integrated weed management system in which effective herbicide programs serve as the indispensable foundation, supplemented by cultural practices such as crop rotation and use of cover crops. While these non-chemical practices play a valuable role in reducing weed pressure

14

and optimizing herbicide performance, they cannot substitute for effective postemergence herbicide options in row crop agriculture. In selecting among available herbicide programs, growers weigh efficacy, crop safety, cost, and operational risk—including whether a given option carries a history of off-target movement or imposes burdensome training and recordkeeping requirements. And because each of these factors varies across geographies, weed populations, and farming operations, access to every remaining effective herbicide option is essential to ensure that growers retain a sufficient range of programs to address the diverse conditions encountered across the soybean- and cotton-producing regions.

37.     The Enlist system is the only herbicide-tolerant platform available to soybean and cotton growers that permits two broadleaf herbicides effective against key resistant weed species—2,4-D choline and glufosinate—to be tank-mixed in a single postemergence pass. Were the Enlist registration vacated, growers would be forced to rely on the remaining alternatives— principally dicamba and glufosinate, applied alone or sequentially—which would require additional herbicide passes, result in a compressed application window due to dicamba label restrictions, and increase per-acre costs, while reducing the likelihood of achieving commercially acceptable weed control due to the loss of the 2,4-D choline/glufosinate tank-mix option.

### A.     Immediate Economic and Agronomic Harms

38.     Growers make seed-purchasing decisions six to twelve months before the growing season begins, typically finalizing trait platform selection and herbicide program commitments in the fall and winter—well before spring planting. If the registration of Enlist were vacated, growers who have already purchased or contracted for Enlist-tolerant seed for the current or upcoming growing season would find themselves with crops specifically engineered for a herbicide system they can no longer use, resulting in immediate sunk costs.

15

39.     Moreover, growers who transition to dicamba-tolerant crops would be unable to replicate the single-pass tank mix of 2,4-D choline and glufosinate that the Enlist system uniquely provides. Dicamba labels prohibit tank-mixing dicamba with glufosinate, meaning that growers seeking postemergence control from both chemistries would be required to apply each in a separate pass across the field—doubling application costs, fuel, labor, and equipment time—or forgo one of the two herbicides entirely and accept diminished weed control. The result is that growers forced to rely on dicamba and glufosinate as separate applications would face a materially higher likelihood of weed escapes, incomplete control, and the attendant yield losses and seedbank replenishment described herein.

40.     Switching to alternative trait platforms—such as dicamba-tolerant varieties—would require purchasing new seed at additional expense, but these growers would have limited ability to do so on short notice, as seed supply chains operate on annual production cycles and alternative trait platforms may not be available in the quantities or maturities (i.e., maturity group ratings that determine adaptation to a given geography and growing season length) required.

41.     Even if growers were permitted to exhaust existing herbicide inventory for the current season, those who employ multi-year crop rotation plans—designed to maintain soil health, limit pest pressure, and manage the development of herbicide resistance—would nonetheless face substantial disruption and costs, as their rotational sequences and associated trait platform and herbicide program selections have been established years in advance on the assumption that the Enlist system would remain available. The resulting forced departure from carefully designed rotational sequences would compromise the agronomic and resistance management objectives those plans were intended to achieve, potentially leading to suboptimal

16

weed control, accelerated selection for resistance to the remaining effective herbicides, degraded soil health, and diminished crop yields across multiple growing seasons.

42.     Moreover, growers and custom applicators who have configured their spray equipment for the Enlist system would face significant operational burdens in transitioning to dicamba. Dicamba labels mandate specific approved nozzle types, the addition of both drift reduction and volatility reduction agents to every tank mix, and completion of annual applicator training—none of which is required for Enlist One. Applicators who have not previously used dicamba postemergence would need to acquire and install approved nozzles, recalibrate sprayers, and complete the required training before any application could occur. Beyond these threshold requirements, growers would face a learning curve in adapting to dicamba's complex label restrictions, including temperature cutoffs, wind speed windows, time-of-day limitations, mandatory recordkeeping, and sensitive crop buffers. The aggregate time and expense required to reconfigure equipment, complete mandatory training, and adapt application practices would impose significant operational costs, with the added risk of inadvertent noncompliance resulting in regulatory penalties.

43.     The disruption caused by vacatur would extend beyond individual growers to the broader agricultural supply chain. Retailers and distributors holding existing inventory of Enlist One could face immediate economic losses if they were prohibited from selling their inventory. Seed companies that have invested in developing, producing, and marketing Enlist-tolerant varieties would face diminished demand for those products, undermining years of research and development investment. Custom applicators who have invested in equipment and training specific to the Enlist system would similarly be adversely affected. The cascading nature of these

17

supply chain disruptions would compound the direct harm to growers and further disrupt weed management programs across affected regions.

### B.    Crop Yield Loss

44.    Vacatur of the Enlist One registration would directly increase the severity and frequency of crop yield losses by eliminating the 2,4-D choline/glufosinate tank mix—the most effective postemergence herbicide combination for controlling waterhemp, Palmer amaranth, giant ragweed, and horseweed. Without this tank mix, growers would face increased risk of weed escapes and prolonged weed competition during the critical early-season window, potentially resulting in substantial yield reductions.

45.    These four weeds reduce crop growth and yield through aggressive competition for light, space, water, and nutrients, and are among the most damaging weed species in row crop agriculture. Palmer amaranth is particularly destructive, with research studies documenting cotton yield reductions of 13 to 92% depending upon Palmer amaranth density and timing of infestation (MacRae et al., 2013; Morgan et al., 2001; Rowland et al., 1999). Soybean yield reductions of up to 80% due to Palmer amaranth have been observed (Bensch et al., 2003). Waterhemp caused 43 to 56% soybean yield loss when allowed to compete from the unifoliate leaf stage or through the entire growing season (Bensch et al., 2003; Hager et al., 2002). Giant ragweed at a density of just 1 plant per 4 m² was sufficient to cause cotton lint yield losses of 50% (Barnett and Steckel 2017). Yield losses in soybean of 46 to near 100% have been observed, with researchers concluding that a total weed-free period of 8 to 10 weeks after planting is required to fully protect yield potential (Baysinger and Sims, 1991). Horseweed caused 28 to 46% cotton lint yield loss depending upon density and length of interference (Steckel and Gwathmey 2009).

18

46.     The economic magnitude of these yield reductions is substantial. At prevailing commodity prices, the yield losses documented in the literature for waterhemp, Palmer amaranth, giant ragweed, and horseweed translate to revenue losses of hundreds of dollars per acre for individual growers. These figures reflect lost crop revenue alone and do not account for the additional costs growers would incur in attempting alternative weed management programs following vacatur.

## C.     Escalating Long-Term Harms

47.     Waterhemp, Palmer amaranth, and horseweed are among the most prolific seed producers in row crop agriculture, and the failure to control even a small number of plants has outsized consequences for future weed pressure. A single female waterhemp plant can produce anywhere from 35,000 to more than one million seeds (Growiwm.org). Palmer amaranth routinely produces 200,000 to 400,000 seeds per plant and is capable of producing upwards of a million—more than any other weed species encountered in row crop production (Growiwm.org; Hartzler 2026). Horseweed, while producing fewer seeds per plant—up to approximately 200,000—compensates through windborne seed dispersal, which spreads infestations well beyond the field of origin (Growiwm.org). The practical consequence of this reproductive capacity is that even a handful of uncontrolled plants in a single season can replenish the soil seedbank sufficiently to sustain or intensify weed pressure for years. For this reason, the consensus among weed scientists has long been that growers must maintain near-zero tolerance for waterhemp and Palmer amaranth seed production.

48.     Modeling and field research consistently demonstrate that eliminating seed production from these species for three to five consecutive years is necessary before meaningful reductions in seedling emergence pressure can be achieved (Growiwm.org). Loss of Enlist One

would directly compromise growers' ability to attain the level of season-long weed control necessary to prevent seed production, resulting in rapid seedbank replenishment and escalating weed populations in subsequent growing seasons. Because each year of inadequate control compounds the problem—adding new seed cohorts to an already persistent seedbank—the agronomic and economic consequences would not be confined to a single season but would cascade across multiple years, making future management progressively more difficult and costly.

1.      <u>Accelerated Herbicide Resistance</u>

49.      Every herbicide carries the potential to lose utility due to resistance in certain situations, but that does not render it without value. Removing effective herbicides such as Enlist from the market would increase weed control failures, raise production costs, and accelerate resistance to the remaining effective herbicides.

50.      Given the biology of waterhemp and Palmer amaranth, resistance to 2,4-D choline, glufosinate, and dicamba can be expected to continue developing. Growers need continued access to the most effective herbicide options to maintain manageable weed populations and preserve the ability to implement non-chemical weed management practices. Loss of Enlist One would concentrate selection pressure on glufosinate and dicamba—the only two other effective postemergence options—accelerating resistance development to both. The resulting weed control failures would increase the soil weed seedbank, as surviving plants produce seed that persists in the soil for subsequent years, many carrying resistance traits.

51.      Because the probability of resistance to a mixture of two effective herbicides (i.e., 2,4-D choline and glufosinate) is lower than the probability of resistance to any single herbicide

20

applied alone, loss of this tank-mix option would accelerate the development of resistance to remaining herbicide tools available to growers.

### 2. Environmental and Conservation Consequences

52. If growers no longer had access to Enlist One, some growers may increase their use of tillage as a weed-management practice, despite its limitations. Such a change would result in a reduction of the crop production acres utilizing a no-tillage system, which is designed to prevent soil erosion. This increase in tillage and concomitant increased soil erosion degrades the topsoil and crop yields and increases the risk of runoff into waterways. Tilling the soil breaks up soil aggregates and can lead to significant compaction and increased susceptibility to wind and water erosion, causing harm to both the field and the surrounding environment.

53. As discussed above, EPA has documented a history of off-target crop damage complaints associated with dicamba use (EPA 2020). Increased reliance on dicamba resulting from the loss of Enlist One could increase the frequency of off-target incidents, imposing additional costs and harm on neighboring growers and the surrounding environment.

### 3. Erosion of Integrated Weed Management

54. Based on the biology and resistance profiles of waterhemp, Palmer amaranth, giant ragweed, and horseweed described in this declaration, non-chemical practices cannot replace herbicides—particularly the few effective postemergence herbicides that still control these species. These weeds will always require the use of both preemergence and postemergence herbicides in addition to cultural practices.

55. The purpose of integrating non-chemical practices is to optimize crop competitiveness, reduce the number of weeds that must be controlled with herbicides, and suppress weed growth so that herbicide applications can be made in a timely manner. Many

growers already employ such practices to the extent practical for their particular operation, tillage system, and weed spectrum. For example, most have adopted narrow row spacing to improve canopy closure and weed suppression, which in turn reduces weed pressure and the need for additional herbicide applications—an expense growers avoid when possible.

56.    However, many commonly discussed non-chemical practices are not feasible for many growers or cannot meaningfully substitute for an effective postemergence herbicide. Delayed planting, for instance, requires large-acreage growers to forgo planting when soil conditions first permit, risking weather-related planting failures and well-established yield reductions from late planting.

57.    Cover crops—crops planted between cash crop seasons primarily to suppress weeds, prevent soil erosion, and improve soil health—can effectively suppress weed emergence once the cash crop is planted. However, they cannot be universally employed because they impose added costs for seed, planting, and spring termination, require management skills and equipment that growers may not possess, and can reduce crop stand density and yields when not managed properly.

58.    Tillage can remove small weeds between crop rows but cannot reach weeds within the row, is far slower than herbicide application, and—as discussed above—undermines the conservation practices that many growers are required or incentivized to maintain. Moreover, tillage produces inconsistent results across weed species, actually promoting giant ragweed populations due to the greater viability of its buried seed (Growiwm.org).

59.    In my experience, growers are far more likely to invest in and successfully implement non-chemical practices when their weed populations are under control through an effective herbicide program. Loss of Enlist One would compromise that control, leading to the

22

escalating weed populations, seedbank replenishment, accelerated resistance development, and yield losses described above. These consequences would in turn overwhelm the supplemental practices that growers currently employ, making integrated weed management more difficult to implement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 22, 2026

Mark M. Loux, Ph.D.

23

**References**

Engenia herbicide label, 2026. NVA 2026-04-0385-0030.

Enlist One herbicide label, 2024. CD02-427-022.

Liberty Ultra herbicide label, 2025. NVA 2025-04-0691-0291.

Styrax herbicide label, 2026. US91145728A.

Barber, T, B. Scott, J. K. Norsworthy, and T. Butts. 2025. Distribution and management of herbicide-resistant Palmer amaranth in Arkansas. U. Arkansas Research and Extension. FSA2188.

Barber, T. et al., 2026. Arkansas 2026 Recommended Chemicals for Weed and Brush Control. U. Arkansas Research and Extension, MP44.

Barnett, K. A, and L. E. Steckel. 2017. Giant ragweed (*Ambrosia trifida*) competition in cotton. Weed Sci., 61:543-548.

Baysinger, J. A. and B. D. Sims. 1991. Giant ragweed (Ambrosia trifida) interference in soybeans (Glycine max). Weed Sci., 39:358-362.

Bensch, C. N, M. J. Horak, and D. Peterson. 2003. Interference of redroot pigweed (*Amaranthus retroflexus*), Palmer amaranth (*A. palmeri*), and common waterhemp (*A. rudis*) in soybean. Weed Sci, 51:37-43.

Corteva Agriscience, The Enlist system—Taking it to U.S. corn acres. 2026. https://www.corteva.com/us/Resources/crop-protection/corn/taking-enlist-to-corn-acres.html. Accessed: July 12, 2026.

Dewerff, R., E. Bick, P. J. Liesch, G. Nice, M. Renz, D. Smith, R. Werle, and J. Kampa. 2025. Pest Management in Wisconsin Field Crops. U. Wisconsin Extension, A3646.

EPA. EPA Implements Strongest Protections in Agency History for Over-the-Top Dicamba Use on Cotton and Soybeans for Next Two Growing Seasons. Feb. 6, 2026. https://www.epa.gov/newsreleases/epa-implements-strongest-protections-agency-history-over-top-dicamba-use-cotton-and.

EPA. Final Registration of Enlist Duo[tm] Herbicide. 2014. https://www.epa.gov/sites/default/files/2014-10/documents/final_registration_-_enlist_duo.pdf.

EPA. Memorandum Supporting Decision to Approve Registration for the Uses of Dicamba on Dicamba Tolerant Cotton and Soybean. 2020. https://www.epa.gov/sites/default/files/2020-10/documents/dicamba-decision_10-27-2020.pdf.

Essman, A. et al., 2026. 2026 Weed Control Guide for Ohio, Indiana, Illinois, and Missouri. Ohio State U. Extension. ANR 789. 239 pp.

Everman, W. 2025. Weed Management *in* 2025 Soybean Production Guide. NC State Extension, AG-835. PP 59-83.

GROW – Getting Rid of Weeds Through Integrated Weed Management. https://growiwm.org. Last accessed on June 20, 2026.

Hager, A. G., L. M. Wax, E. W. Stoller, and G. A. Bollero. 2002. Common waterhemp (*Amaranthus rudis*) interference in soybean. Weed Sci., 50:607-610.

Hartzler, R. 2026. Palmer amaranth: ID, biology, and management. Integrated Crop Management, Iowa State U. crops.extension.iastate.edu.

Jenkins, J. 2026. Progressive Farmer Production Blog: OTT Dicamba. March 5, 2026. https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/states-impose-tighter-restrictions.

Landau C, Bradley K, Burns E, DeWerff R, Dobbels A, Essman A, Flessner M, Gage K, Hager A, Jhala A, Johnson PO, Johnson W, Lancaster S, Lingenfelter D, Loux M, Miller E, Owen M, Sarangi D, Sikkema P, Sprague C, VanGessel M, Werle R, Young B, Williams M II (2025). Weather and glufosinate efficacy: a retrospective analysis looking forward to the changing climate. Weed Sci. 73(e32), 1–7. https://www.cambridge.org/core/services/aop-cambridge-core/content/view/10C24C91CC2AC7BB9E2FF1541DAD4BBF/S0043174524001012a.pdf/weather-and-glufosinate-efficacy-a-retrospective-analysis-looking-forward-to-the-changing-climate.pdf.

Legleiter, T. 2020. Palmer amaranth and waterhemp control in corn and soybean. U. Kentucky Cooperative Extension Serv. AGR-260.

MacRae, A. W., T. M. Webster, L. N. Sosnoskie, and A. S Culpepper. 2013. Cotton yield loss in response to length of Palmer amaranth (*Amaranthus palmeri*) interference. J. Cotton Sci., 17:227-232.

Manuchehri, M. R., P. A Dotray, and J. W. Keeling. 2017. Enlist weed control systems for Palmer amaranth (Amaranthus palmeri) management in high plains cotton. Weed Tech., 31:793-798.

Morgan, G. D, P. A. Baumann; and J. M. Chandler. 2001. Competitive impact of Palmer amaranth (*Amaranthus palmeri*) on cotton (*Gossypium hirsutum*). Weed Technology, 15:408-412.

Rowland, M. W., Murray, D. S., and Verhalen, L. M. 1999. Full-season Palmer amaranth (*Amaranthus palmeri*) interference with cotton (*Gossypium hirsutum*). Weed Sci. 47: 305–309.

Singh, N., T. J. Peters, S. L Naeve, R. P Miller, and D. Sarangi. 2025a. Effect of herbicide application timing and sequence on waterhemp (Amaranthus tuberculatus) and common lambsquarters (Chenopodium album) control, Enlist E3 soybean yield, and economic returns. Weed Tech, 39:1-12.

Singh, N, T. J. Peters, S. L Naeve, D. A. Nicolai, R. P Miller, and D. Sarangi. 2025b. A system approach for waterhemp (Amaranthus tuberculatus) management in soybean-sugar beet rotation. Weed Tech, 39:e104.

Shyam, C., P. S. Chahal, A. J. Jhala, and M. Jugulam. 2021. Management of glyphosate-resistant Palmer amaranth (Amaranthus palmeri) in 2,4-D-, glufosinate-, and glyphosate-resistant soybean. Weed tech., 35:136-143.

Sprague, C. L., and E. E. Burns. 2026. 2026 Weed Control Guide for Field Crops, Michigan State University Extension. https://www.canr.msu.edu/weeds/2026-msu-weed-control-guide. Last accessed on June 15, 2026.

Sprague, C. L., and E. E. Burns. Multiple herbicide-resistant waterhemp and Palmer amaranth control in Michigan: keys to management in soybean, corn, and alfalfa. Michigan State University Extension, MSUWS06-2025.

Steckel, L. E., and C. O. Gwathmey. 2009. Glyphosate-resistant horseweed (Conyza canadensis) growth, seed production, and interference in cotton. Weed Sci., 57:346-350.

Steckel, L. 2026. 2026 Weed Control Manual for Tennessee. U. Tennessee Extension, PB 1580.

Webster, T. M., M. M. Loux, E. E. Regnier, and S. K. Harrison. 1994. Giant ragweed (Ambrosia trifida) canopy architecture and interference studies in soybean (Glycine max). Weed Tech., 8:559-564.