**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR FOOD SAFETY, *et al*.,

      Plaintiffs,

   v.

ENVIRONMENTAL PROTECTION AGENCY,
*et al*.,

      Defendants,

and

CORTEVA AGRISCIENCE, LLC,

      Defendant-Intervenor.

Case No. 1:23-cv-1633


**DECLARATION OF TAMMIE JONES-JEFFERSON**

I, Tammie Jones-Jefferson, declare:

## I.    Background and Experience

1.    I serve as the Head of North American Regulatory and Stewardship for Corteva Agriscience LLC ("Corteva"), a position I have held since 2022. In this capacity, I am responsible for developing and implementing regulatory strategies for Corteva's pesticide products, including GF-3335, also known by its trade name Enlist One™ (hereinafter "Enlist One"), which is an end-use herbicide product containing the active ingredient 2,4-dichlorophenoxyacetic acid ("2,4-D") choline salt. Together with my team, I develop and execute processes necessary to support the initial registration and continued registration of Corteva's products in the United States and Canada.

2.    From 2018 to 2022, I served in various regulatory leadership roles within Corteva. From 2021 to 2022, I was Corteva's leader for U.S. Crop Protection. In this role, I was responsible for developing and negotiating data requirements and study protocols with the U.S. Environmental Protection Agency ("EPA") and state regulatory authorities; planning and budgeting regulatory studies for product development and registration review; collaborating with commercial and field biologists to identify customer needs; and reviewing marketing materials and research. From 2020 to 2021, I served as Corteva's Global Regulatory Leader and Business Partner, where I led global regulatory strategy development and provided regulatory guidance for the development and implementation of business strategies.

3.    Before joining Corteva, I served in similar roles at its predecessor, Dow AgroSciences LLC ("DAS"). DAS was a wholly owned subsidiary of Dow Chemical Company, specializing in crop protection chemicals, seeds, and biotechnology solutions. At DAS, I served as the U.S. Federal and State Regulatory Manager from 2013 to 2019, where I led the development

and implementation of regulatory strategies to support initial pesticide registrations, amendments to existing registrations, and the stewardship of existing pesticides through EPA's registration review process.

4.	From 2010 to 2013, I was DAS's Launch Product Stewardship Leader for the Enlist Weed Control System, where I led the development and implementation of product stewardship strategies for the Enlist line of products. The Enlist system is an integrated crop protection system combining herbicide products containing an innovative 2,4-D choline salt formulation—designed to have near-zero volatility and reduced risk of spray drift—with proprietary seed traits engineered to tolerate 2,4-D. In this role, I oversaw efforts to mitigate risks for the Enlist line of products while maintaining their long-term efficacy and value. These efforts included product formulation, label instructions, permissible uses, and outreach to growers to ensure proper application.

5.	Prior to assuming these regulatory leadership positions, I served as a research and development analytical chemist at DAS. In total, I have over 39 years of experience in the crop protection industry, spanning research and development, product stewardship, and regulatory affairs across my tenure at Corteva and its predecessor companies.

6.	I hold a Bachelor of Science degree in Chemistry from Jackson State University.

7.	I understand that, through the above-captioned lawsuit, Plaintiffs Center for Food Safety, Pesticide Action Network North America, and Alianza Nacional de Campesinas seek to vacate Corteva's registration of Enlist One.

8.	As the leader of North American Regulatory and Stewardship for Corteva, I am involved in, and have developed in-depth knowledge of, the regulatory approvals obtained for Enlist One, including the history of the Enlist One registration, its permissible uses, and the scientific research programs that generated the data and other information to support EPA's

registration decisions. I am also familiar with the production and sale of Enlist One, as well as the harm that growers, the environment, and Corteva would suffer if the Enlist One registration were vacated.

## II.     The Development and Registration of Enlist One

9.     Corteva and its predecessor DAS developed Enlist One, along with the formerly registered Enlist Duo®, as components of the Enlist weed-control system—an innovative, integrated crop protection system designed both to address the escalating problem of herbicide-resistant weeds and to reduce the off-target movement risks associated with conventional 2,4-D formulations. The Enlist system pairs the 2,4-D choline salt herbicide active ingredient with proprietary Enlist seed traits for soybeans, cotton, and corn that are tolerant to the herbicide. The two components are functionally interdependent for post-emergence broadleaf weed control: the 2,4-D choline salt herbicide cannot be applied over-the-top of growing soybean or cotton crops absent the complementary tolerant seed trait, and while the Enlist trait confers tolerance to other herbicides as well, its value as a tool for post-emergence broadleaf weed control using 2,4-D—a critical MOA for managing resistant weeds—depends on the availability of the registered herbicide. This integrated design was a deliberate innovation intended to provide growers with a new, effective mode of action for post-emergence control of broadleaf weeds—including species that had developed resistance to glyphosate and other widely used herbicides—while simultaneously minimizing off-target herbicide movement.

10.     Because conventional soybean and cotton lack tolerance to 2,4-D and conventional corn is tolerant to 2,4-D only in specific, early growth stages, Corteva and its predecessor DAS also developed proprietary soybean, cotton, and corn varieties genetically engineered to withstand exposure to the herbicide—known as Enlist (2,4-D-tolerant) crops. The pairing of Enlist One with

Enlist-tolerant seed is what enables growers to apply 2,4-D over-the-top of growing crops without causing crop injury.

11.     On January 31, 2017, EPA issued the initial registration for Enlist One, authorizing its use for the control of broadleaf weeds in Enlist-tolerant corn, cotton, and soybean. Notably, the registration allowed growers to apply Enlist One "over-the-top" of Enlist-tolerant crops—that is, directly onto the growing crop. The registration was for a five-year term and set to expire in January 2022 absent an EPA-approved extension.

12.     In April 2021, Corteva applied to EPA for an extension of the Enlist One registration. In January 2022, EPA granted a seven-year extension, establishing a new expiration date of January 11, 2029, subject to various label restrictions including use limitations, runoff mitigation requirements, and an herbicide resistance management plan.

13.     Whereas Enlist One contains a single active ingredient—2,4-D choline salt—the formerly registered Enlist Duo contained both 2,4-D choline salt and glyphosate dimethylammonium salt ("glyphosate"). In September 2025, Corteva voluntarily requested that EPA cancel the Enlist Duo registration due to low demand, and EPA granted the cancellation in February 2026. Enlist One is accordingly the sole remaining 2,4-D choline salt herbicide labeled for over-the-top use.

### III.     Corteva's Investment In Product Registration

14.     DAS began developing the 2,4-D choline salt formulation in 2008. Beginning with the research underlying that invention, DAS and its successor Corteva have collectively invested hundreds of millions of dollars over nearly two decades to research, develop, register, and commercialize the Enlist system—encompassing both the 2,4-D choline salt herbicide formulation and the complementary Enlist herbicide-tolerant seed traits.     These investments include

formulation chemistry and optimization, laboratory, field and wind tunnel research to verify volatility and drift reduction, laboratory and greenhouse efficacy testing, multi-year field trials across diverse geographies and cropping systems, comprehensive environmental fate and transport studies, human health and ecological risk assessments, product chemistry and residue chemistry studies, manufacturing process development and scale-up, and the preparation and prosecution of the registration application and supporting data submissions before EPA under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). Each of these undertakings required years of sustained investment before any commercial return could be realized.

15.     In addition to the investment required to develop and register the 2,4-D choline salt herbicide itself, the commercialization of Enlist One necessitated the parallel development of crops genetically engineered to tolerate 2,4-D exposure—without which the herbicide could not be applied post-emergence on growing crops. Corteva and its predecessor DAS accordingly invested significant resources to discover, develop, and validate the Enlist herbicide-tolerant trait; breed that trait into commercially viable soybean, cotton, and corn germplasm; conduct the extensive field performance and environmental safety testing required for regulatory review; and obtain the requisite deregulation of Enlist-tolerant crop varieties from the U.S. Department of Agriculture, as well as cultivation and import approvals from international regulatory authorities. This dual investment—in both the herbicide and the complementary seed technology—distinguishes the Enlist system from conventional pesticide products. The magnitude of that commitment was predicated on the reasonable expectation that, once EPA determined Enlist One satisfies the FIFRA registration standard, the registration would remain in effect for its full term.

16.     As required by the registration terms, Corteva has developed and implemented a comprehensive herbicide resistance management plan, dedicating significant resources to

6

investigating allegations of herbicide resistance, providing growers with recommendations to control and contain suspected resistant weeds, and collecting samples of those weeds where appropriate to advance herbicide resistance management efforts. Corteva conducts greenhouse or laboratory testing on suspected herbicide-resistant weeds to confirm or rule out resistance. Where warranted, Corteva also conducts parallel resistance testing against both 2,4-D and dicamba to evaluate the prevalence of cross-resistance between these synthetic auxin herbicides.

17.     As further required by the registration terms, Corteva dedicates significant resources each year to conducting annual grower surveys and preparing and submitting to EPA annual reports summarizing the survey results. These surveys compile information on how Enlist One is used in the field, including the site and crop of application, application timing, the number of applications each growing season, whether the product is tank mixed with other herbicides, and if so, the identification of the active ingredients in the tank mixture.

18.     Corteva has also invested significant resources in stewardship and educational materials to ensure that Enlist One is used safely and in accordance with the label, including its herbicide resistance management plan. These efforts include developing and disseminating comprehensive training materials to retailers, farmers, and applicators, including general public training modules and advanced retailer training programs accessible online. The modules provide information on how Enlist® traits and Enlist One work, label requirements, and best management practices to prevent and manage weed resistance.

## IV.     Benefits of Enlist One

### A.     Effective Post-Emergence Herbicide

19.     Enlist One provides significant benefits for growers as a post-emergence herbicide—that is, an herbicide applied after weeds have emerged from the soil—that can be

applied over-the-top of Enlist-tolerant soybean, corn, and cotton crops. Post-emergence herbicide application is essential to effective weed management because weed competition is most damaging to crop yield during the growing season, and alternative application methods—such as pre-plant burndown (*i.e.,* applying herbicide to kill existing weeds before planting) or pre-emergence soil treatments (*i.e.,* applying herbicide to the soil before weeds emerge)—rarely provide season-long control for all weed species. Without a post-emergence herbicide application, growers can lose significant crop yield even where a pre-emergence herbicide was applied.

20.     Unlike conventional 2,4-D amine and ester formulations, which are not labeled for use after crop emergence on soybean or cotton, Enlist One permits over-the-top application on Enlist-tolerant soybean and cotton varieties.

21.     While conventional 2,4-D formulations may be applied to non-Enlist corn only during a narrow post-emergence window—typically between the V2 and V5 growth stages, when the crop is approximately four to eight inches tall—Enlist One can be applied on Enlist-tolerant corn through the V8 growth stage or until the crop reaches 30 inches in height, whichever occurs first. This substantially extended application window affords corn growers greater flexibility to time herbicide applications in response to actual weed emergence, rather than being constrained to a brief early-season period during which weed pressure may not yet have fully materialized.

**B.     Herbicide Resistance Management**

22.     Herbicides are classified by their mode of action ("MOA")—the specific biochemical mechanism by which they control target plants. Effective herbicide resistance management requires growers to rotate among herbicides with different MOAs, thereby reducing the selection pressure that any single MOA exerts on weed populations. When herbicides with the same MOA are applied repeatedly, susceptible individual weeds are eliminated while naturally

tolerant individuals survive and reproduce, giving rise to resistant populations. The fewer distinct MOAs available to a grower, the more rapidly this selection pressure concentrates on the remaining options, accelerating the evolution of resistance and diminishing the efficacy of the herbicides still in use.

23.    Enlist One is predominantly used after crop emergence to control broadleaf weeds, with a particular focus on Amaranthus (pigweed) species—including Palmer amaranth and waterhemp—which are among the most agronomically damaging and difficult-to-control weeds in U.S. soybean, corn, and cotton production.

24.    These Amaranthus species have developed widespread resistance to other commonly used post-emergence herbicides, particularly glyphosate, acetolactate synthase ("ALS") inhibitor, and protoporphyrinogen oxidase ("PPO") inhibitor herbicides. Confirmed instances of resistance to glufosinate are also now being reported. As a result, the range of viable post-emergence alternatives available to growers has narrowed considerably.

25.    This narrowing of available post-emergence options is well documented. In its January 2022 memorandum on the Use, Usage, and Current and Future Benefits of Enlist One and Enlist Duo Herbicides in Corn, Soybean, and Cotton ("Use and Benefits Memo."), EPA confirmed that "soybean and cotton growers facing herbicide-resistant broadleaf weeds ha[ve] only three primary options for postemergence herbicide control of these weeds: a dicamba-tolerant system (Xtend), a 2,4-D tolerant system (Enlist), and a glufosinate tolerant system (Liberty Link)." Use and Benefits Memo. at 8.[1] Of these three systems, the viability of glufosinate-only programs is increasingly compromised by the continued emergence of glufosinate-resistant weed populations, *id.* at 2, further compounding the constraints described above. As a practical matter, only dicamba

---

[1] https://downloads.regulations.gov/EPA-HQ-OPP-2021-0957-0010/content.pdf.

9

and the 2,4-D choline salt in Enlist One—both synthetic auxin herbicides within MOA Group 4—remain as viable post-emergence options for the control of resistant broadleaf weeds in soybean and cotton. *See* EPA, Registration Renewal Enlist 2,4-D on Genetically Modified 2,4-D-Tolerant Corn, Cotton and Soybean: Incidents and Impacts of Potential Mitigation, at 19 (Jan. 11, 2022) ("Incidents and Impacts Memo.")[2] (explaining that after crop emergence, glufosinate serves "primarily [as] a partner in resistance management programs").

26.    Within this constrained landscape, Enlist One offers a critical resistance-management advantage. Because Enlist-tolerant soybean, cotton, and corn varieties have been engineered to tolerate both 2,4-D and glufosinate, growers using the Enlist system can apply Enlist One together with glufosinate—an approved tank-mix partner—in a single application pass, simultaneously deploying two distinct MOAs (Group 4 and Group 10, respectively). This capacity for simultaneous deployment of multiple MOAs is a cornerstone of effective resistance management: by exposing target weeds to two unrelated modes of action at once, the probability that any individual weed survives both is dramatically reduced, slowing the evolution of resistance to either herbicide.

27.    Unlike Enlist One, dicamba cannot be tank-mixed with glufosinate due to chemical incompatibility, precluding growers who rely on dicamba-based systems from combining these two distinct MOAs in a single pass. To achieve comparable MOA diversity, those growers must either bear the additional cost and operational burden of a separate application pass or forgo the second MOA entirely—concentrating selection pressure on a single post-emergence herbicide and accelerating the development of resistance. Vacatur would eliminate the Enlist's single-pass

---

[2] https://downloads.regulations.gov/EPA-HQ-OPP-2021-0957-0011/content.pdf.

10

flexibility, depriving growers of one of the most effective resistance-management tools currently available.

28.    The continued availability of Enlist One is therefore critical not only as a standalone weed-control tool but also as an essential component of herbicide resistance management. By providing an alternative MOA for rotation, Enlist One reduces the selection pressure on the limited remaining herbicide options and delays the evolution of resistance to available post- and pre-emergence herbicides.

### C.    Superior Drift and Volatilization Profile

29.    Beyond preserving the efficacy of the remaining herbicide MOAs, Enlist One confers significant environmental and agricultural benefits relative to other available post-emergence herbicides by virtue of its substantially lower volatilization potential and reduced propensity for off-target spray drift.

30.    Corteva engineered the 2,4-D choline salt formulation specifically to address the two principal mechanisms of off-target herbicide movement: volatilization—the process by which an applied herbicide transitions from liquid to vapor and is carried by air currents beyond the target field—and spray drift—the physical displacement of spray droplets away from the intended application site during or shortly after spraying. Both phenomena can cause significant injury to neighboring crops, non-target vegetation, and sensitive habitats. As EPA has recognized, dicamba—the only other primary post-emergence herbicide option for control of resistant broadleaf weeds in soybean and cotton—has a history of significant volatilization and drift concerns. See Incidents and Impacts Memo. at 9 (documenting thousands of reported incidents of alleged crop damage from over-the-top dicamba applications).

31.     Enlist One's choline salt formulation was designed to substantially reduce both volatilization potential and the generation of fine spray droplets most susceptible to drift, resulting in markedly lower off-target movement than available alternatives. The magnitude of Enlist One's superior off-target movement profile is reflected in the respective EPA-mandated buffer zone requirements. Enlist One generally requires only a 30-foot downwind in-field buffer, whereas dicamba generally requires a 240-foot downwind buffer—eight times greater—for all applications. These disparate buffer requirements have direct agronomic and environmental consequences. From an agronomic standpoint, larger mandatory buffers reduce the treatable acreage within each field, leaving portions of the field unprotected from weed competition and diminishing overall crop yield. From an environmental standpoint, Enlist One's substantially lower propensity for off-target movement reduces the likelihood of herbicide exposure to non-target crops on neighboring farms, native plant communities, pollinator habitat, and other sensitive ecological resources surrounding the application site.

32.     Enlist One's superior environmental effects profile is reflected in the minimal number of adverse events reported by growers from the use of the herbicide. Pursuant to section 6(a)(2) of FIFRA, which requires registrants to report adverse effects and incidents to EPA within specified deadlines, Corteva has developed a comprehensive program for submission and review of adverse effects reports. Despite such reporting, data through August 2021 demonstrates there had only been 16 reported incidents of alleged crop damage potentially caused by application of Enlist One or Enlist Duo, EPA_01024286, compared to the thousands of reported incidents related to over-the-top dicamba applications, Incidents and Impacts Memo. at 9 (Jan. 11, 2022).[3]

---

[3] https://downloads.regulations.gov/EPA-HQ-OPP-2021-0957-0011/content.pdf.

### D.      Greater Application Flexibility and Reduced Operational Burden

33.      Due to its superior drift and volatilization profile, Enlist One is subject to fewer application restrictions and operational requirements than dicamba, affording growers greater flexibility and lower per-acre application costs.

34.      Over-the-top applications of dicamba require the addition of both an approved pH buffering agent—often called a volatility reduction agent—and a drift reduction agent. Because dicamba volatility increases at low pH levels—and even trace quantities of off-target dicamba vapor can cause severe injury to non-tolerant crops—EPA mandates the use of a pH buffering agent to stabilize the spray solution and suppress volatilization, as well as a drift reduction agent to increase spray droplet size and minimize physical displacement of spray droplets beyond the target field. The Enlist One label imposes no comparable adjuvant requirements, eliminating the additional material costs and application complexity associated with dicamba use.

35.      Enlist One also offers growers greater flexibility in the timing of post-emergence applications. Dicamba is subject to stringent temperature-based application restrictions: it cannot be applied when ambient temperatures reach 95°F and its application is "severely limited" when temperatures reach 85°F because "[h]eat dramatically increases volatility and drift risk." *See* U.S. EPA, Registration of Dicamba for Use on Dicamba-Tolerant Crops.[4] Ambient temperatures routinely exceed these thresholds during the growing season across much of the soybean-, corn- and cotton-producing regions of the United States, rendering dicamba unavailable precisely when post-emergence weed pressure is often at its greatest. Enlist One is not subject to a maximum temperature restriction, offering growers flexibility to spray when conditions are ideal for weed

---

[4] https://www.epa.gov/ingredients-used-pesticide-products/registration-dicamba-use-dicamba-tolerant-crops.

control. These temperature-based limitations on dicamba use also carry significant herbicide resistance management implications. When growers are unable to apply dicamba during periods of peak weed pressure due to elevated temperatures, the resulting delays in application can allow weeds to escape control and propagate resistant populations, thereby accelerating the evolution of resistance.

36.    Moreover, Enlist One offers greater tank-mix flexibility than dicamba. Enlist One is compatible with over 1,700 tank-mix partners—including herbicides (such as glufosinate), fungicides, and insecticides—enabling growers to address multiple crop protection needs in a single application pass. By contrast, dicamba tank mixes are much more restricted. The herbicide generally can only be mixed with glyphosate and residual pre-emergence herbicides. This restricted tank-mix compatibility reflects a resistance-management limitation of dicamba-based systems as described in Section IV.B.

## V.    Harm To Growers And The Environment From Vacatur

37.    Vacatur would remove the sole registered 2,4-D choline salt product from the market, which would in turn narrow the range of available post-emergence herbicide options, accelerate the spread of resistant weed populations, intensify selection pressure on the remaining herbicides, and ultimately reduce crop yields.

### A.    Agronomic and Environmental Harm

38.    Vacatur of the Enlist One registration would deprive growers of the agronomic benefits described in Section IV—including effective post-emergence control of herbicide-resistant broadleaf weeds, preservation of MOA diversity for resistance management, and superior application flexibility—while simultaneously eliminating the environmental advantages that Enlist One's reduced drift and volatilization profile confers relative to available alternatives. As set forth

below, vacatur would not merely remove a single product from the market—it would increase the environmental risks associated with post-emergence weed control by compelling growers to adopt alternatives with greater potential for off-target herbicide movement and ecological harm.

39.    Vacatur would leave soybean and cotton growers with few viable post-emergence alternatives for the control of herbicide-resistant broadleaf weeds, effectively channeling them toward dicamba-based crop protection systems. EPA has recognized that dicamba has a history of materially greater risk of volatilization and spray drift compared to Enlist One. *See* Incidents and Impacts Memo. at 9; *see also* Registration of Dicamba for Use on Dicamba-Tolerant Crops (imposing extensive application restrictions to mitigate volatilization and drift risks).

40.    Vacatur would also cause distinct environmental harm by driving growers who currently use Enlist One for pre-plant burndown and post-emergence corn applications to revert to conventional 2,4-D amine and ester formulations. These older formulations do not have the volatilization and spray drift improvements engineered into the 2,4-D choline salt formulation, resulting in the potential for greater risk of off-target movement and damage to non-target vegetation. Moreover, because seed purchasing decisions are made well in advance of the growing season, vacatur would leave growers who have already committed to Enlist-tolerant soybean and cotton seed with no registered 2,4-D product labeled for over-the-top application on those crops, creating a significant risk that some growers will resort to applying conventional 2,4-D formulations in a manner not authorized by any existing label—in violation of FIFRA—further compounding the potential for off-target movement and ecological harm. In sum, vacatur would yield net-negative environmental outcomes by replacing a product engineered for reduced environmental impact with alternatives that pose greater ecological risks.

B.        **Economic Harm to Growers**

41.        Vacatur would impose severe and immediate economic harm on growers who have structured their operations around the Enlist system. Agricultural planting and crop protection decisions are not made on a single-season basis; rather, they require integrated, multi-season planning in which seed selection, herbicide procurement, crop rotation sequencing, and input budgeting are interdependent. Growers typically commit to seed varieties and corresponding crop protection products at least six to nine months before planting, often through binding purchase agreements and prepaid orders that cannot be unwound without substantial financial penalty. Because these commitments are made in reliance on the continued availability of the herbicide system compatible with the selected seed, vacatur would strand growers' existing investments and force costly, disruptive transitions under compressed timelines.

42.        The selection of a particular herbicide-tolerant seed system is a season-defining decision: once a grower plants seed tolerant to one herbicide system, they must rely on the corresponding herbicide for post-emergence weed control throughout the season. Application of an incompatible herbicide during the growing season will damage or destroy the crop. Dicamba, for example, cannot be applied to Enlist-tolerant soybean or cotton after crop emergence without causing crop injury. A grower who has planted Enlist-tolerant seed thus cannot simply substitute dicamba for Enlist One mid-season; the grower's only options would be to forgo effective post-emergence broadleaf weed control—accepting the attendant yield losses—or to abandon the planted crop and replant with a compatible variety, at additional cost.

43.        Even if vacatur were deferred until the commencement of the next growing season, the resulting harm to growers would remain substantial. Because planting and crop protection decisions are made on a multi-season timeline, growers who have already committed to Enlist-

16

tolerant seed varieties for upcoming seasons—through seed purchases, supply contracts, and integrated crop rotation plans—would be unable to unwind those commitments without incurring significant financial losses. Nor could these growers readily pivot to alternative herbicide-tolerant systems on the timeline a delayed vacatur would afford. Securing sufficient quantities of dicamba-tolerant seed, renegotiating supply agreements, and restructuring multi-year crop rotation and weed-management plans could require lead times that extend well beyond a single off-season. The economic harm would be compounded by the loss of any volume-based pricing or early-purchase discounts already secured for Enlist-tolerant seed and Enlist One, which could not be recaptured on replacement purchases made under compressed timelines. Accordingly, even a prospective vacatur effective at the start of the next growing season would disrupt growers' settled expectations and impose costs that cannot be adequately mitigated through delayed implementation alone.

### C.    Economic and Reputational Harm to Corteva

44.    Enlist One is among Corteva's most commercially significant crop-protection products and constitutes the cornerstone of Corteva's integrated Enlist weed-control system. The product is central to Corteva's current revenue generation, its competitive position in the crop-protection market, and its ability to fund ongoing research and development of next-generation agricultural technologies.

45.    As described in Section III, Corteva has invested significant resources in the registration and commercialization of both the 2,4-D choline salt herbicide and the complementary Enlist-tolerant seed technology. Vacatur of the Enlist One registration would undermine Corteva's ability to recoup its investments by eliminating the revenue streams reasonably expected over the useful life of the herbicide. These investments were undertaken in reasonable reliance on EPA's

determination, after extensive scientific review, that Enlist One satisfies the FIFRA standard for registration.

46.     Corteva's business model depends on the ability to recoup its investment in new technologies through sustained commercial returns, which in turn fund continued innovation. Corteva reinvests approximately eight percent of its annual net sales into research and development. Vacatur of the Enlist One registration would eliminate a significant source of the revenue that supports this reinvestment cycle, diminishing Corteva's capacity to develop next-generation crop-protection technologies—an outcome contrary to both the objectives of FIFRA and the long-term interests of growers.

47.     In addition to the loss of Corteva's investment in Enlist One, Corteva stands to lose valuable market share and its reputation as a reliable provider of crop-protection solutions. Vacatur would undermine grower confidence in the stability and dependability of Corteva's product registrations, impairing Corteva's ability to market not only Enlist One but also its broader portfolio of crop-protection products and seed technologies. If growers perceive that a registration may be withdrawn notwithstanding EPA's determination that the product satisfies the FIFRA standard, they will be reluctant to make long-term commitments upon which Corteva's commercial viability depends.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed: July 23, 2026.

_____
Tammie Jones-Jefferson

18